**John L. ELLIS, Plaintiff,**

v.

**EGGHEAD SOFTWARE SHORT–TERM AND LONG–TERM DISABILITY PLANS, Defendants.**

**No. CS–98–0363–JLQ.**

United States District Court,
E.D. Washington.

Sept. 8, 1999.

Kenneth Isserlis, Lee, Michaud & Isserlis, P.S., Spokane, WA, for plaintiff.

Thomas W. McLane, Brian Ernst, Paine Hamblen Coffin Brooke & Miller, LLP, Spokane, WA, for defendants.

## MEMORANDUM OPINION FOLLOWING DE NOVO TRIAL ON THE RECORD AND ORDER REGARDING CALCULATION OF AWARD

QUACKENBUSH, Senior District Judge.

On September 2, 1999, this court held a de novo non-jury trial on the record in accordance with *Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.1999) (en banc), *petition for cert. filed*, 68 U.S.L.W. 3106 (U.S. July 27, 1999). Kenneth Isserlis appeared on behalf of Plaintiff. Brian Ernst appeared on behalf of Defendants. This memorandum opinion is intended to supplement the court's oral opinion in this matter.

## I. Factual and Procedural Background

The following facts are undisputed, unless noted otherwise, as they are all derived from the administrative record ("A.R.") of Plaintiff John Ellis's claim for disability benefits under the Egghead Software Short–Term and Long–Term Disability Plans ("the Plans").

Prior to March of 1997, Ellis was a Retail Project Manager for Egghead Software ("Egghead"). In that capacity, he was in charge of coordinating the installment of, and actually installing, the fixtures in all new Egghead stores. The position required substantial travel and a considerable amount of strenuous physical activity, including climbing, operation of heavy machinery, lifting and carrying heavy loads, and other physical tasks requiring twisting, turning, pushing, and pulling. (A.R. at 113.)

Ellis apparently worked at this job without incident until February 1996, when he first reported to the Rockwood Clinic in Spokane with complaints back and joint pain. (A.R. at 79.) He was seen at that time by Physician's Assistant ("Phys.Asst.") Jeffrey Smith, who noted that the pain was severe enough to support a probable diagnosis of osteoarthritis.

Ellis's joint and back pain persisted. On June 12, 1996, he visited Phys. Asst. Smith with complaints of pain in multiple joints and muscles, depression, fatigue, and an inability to engage in the activities he normally engaged in. Phys. Asst. Smith rediagnosed Ellis's condition as "possible fibromyalgia." (A.R. at 76.) Two weeks later Ellis reported increased pain; Phys. Asst. Smith changed his diagnosis to "probable fibromyalgia." (A.R. at 72.) In August 1996, Ellis again visited Phys. Asst. Smith, this time complaining of episodes of extreme pain in his joints and muscles. Phys. Asst. Smith noted that Ellis presented "classic trigger point pain." This time, the diagnosis was simply "fibromyalgia." (A.R. at 75.)

In September 1996, Ellis, who was suffering from malaise, myalgia, nausea, and vomiting, again sought refuge at the Rockwood Clinic. On this occasion, he met with Phys. Asst. Smith's supervisor, Dr. Kevin Sweeney, who informed Ellis that his fibromyalgia had become extremely aggravated by a viral infection. (A.R. at 74.)

In December 1996, Ellis was examined by another of Phys. Asst. Smith's supervisors, Dr. Patrick Pearce, who examined Ellis for bilateral temporomandibular joint pain. Dr. Pearce diagnosed a serious joint condition and informed Ellis that such problems are often symptoms of rheumatoid disease. (A.R. at 73.)

Meanwhile, Ellis's performance at work was lagging. In a September 1997 letter to Ellis's counsel, Ellis's supervisor indicated that during 1996, Ellis suffered a substantial decrease in physical capacity. Where Ellis was once able to lift and carry fixtures weighing over 200 pounds, his health deteriorated until he could not perform any heavy lifting or work more than 2 to 3 hours before having to take a break of more than one hour. (A.R. at 16–17.) By the end of September 1996, Egghead was forced to contract with one of their

suppliers to help Ellis perform his job. (A.R. at 17.) The then-president and CEO of Egghead, Terence Storm, indicated in a separate letter to Ellis's counsel that if Egghead had not been experiencing economic difficulty in 1996, Egghead would most likely have determined that Ellis was unfit for his job as early as the spring of 1996. (A.R. at 19.) As it was, Ellis remained at his job throughout 1996. Ellis maintains that he took substantial leave time during 1996, but there is no record of any such leave. (A.R. at 19.) However, on January 31, 1997, Egghead informed Ellis that he would be laid off effective March 31, 1997.

On February 3, 1997, Phys. Asst. Smith examined Ellis to check his fibromyalgia symptoms. (A.R. at 71.) On February 26, 1997, Phys. Asst. Smith signed a claim for disability benefits under the Plans, citing fibromyalgia, anxiety, and stress reaction as the basis for the claim. (A.R. at 102.) The date of disability on the form, once it was submitted, was stated as March 14, 1997. The parties are in substantial dispute about whether it was Phys. Asst. Smith or an Egghead employee who filled in the date of disability. In any event, March 14, 1997, was the last day Ellis worked for Egghead. He has not worked since.

Ellis's claim was a joint claim for benefits under the Egghead Short–Term Disability Plan ("STD Plan") and the Egghead Long–Term Disability Plan ("LTD Plan"). (A.R. at 102.) The STD Plan is funded from Egghead's general assets and provides 90 days of disability benefits to any disabled Egghead employee. The LTD Plan is insured by CNA Insurance ("CNA") and provides benefits to Egghead employees who remain disabled more than 90 days after terminating employment. CNA administers both Plans and both Plans are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").

In order to receive benefits under the STD Plan, a participant must be unemployed, "under the regular care of a licensed physician," and unable to perform the substantial and material duties of his "regular occupation." The LTD Plan contains a virtually identical definition of disability for the first 24 months of long-term disability benefits. After the 24–month period has run, however, a participant may continue to receive benefits only if he is disabled from working in "any occupation."

Upon receiving Ellis's claim for benefits, CNA requested and reviewed copies of Ellis's Rockwood Clinic medical records and spoke to Egghead about the claim. (A.R. at 100, 107–09.) On March 25, 1997, without referring the claim file to a physician, CNA denied Ellis's claim, writing that "the medical data contained in your file fails to document any objective medical evidence of a disabling physical impairment." (A.R. at 62. *See also* A.R. at 67.)

On May 16, 1997, Ellis appealed the denial of his claim. As part of the appeal, Ellis's counsel requested that CNA indicate which Plan provision required "objective medical evidence" and asked CNA what would constitute objective evidence of fibromyalgia. (A.R. at 45.) CNA did not respond to the request regarding the Plan provisions but did state that when reviewing claims based on fibromyalgia, it relied on the American Arthritis Foundation's criteria. CNA emphasized that because fibromyalgia is a subjective condition, the Foundation's criteria bases a diagnosis of fibromyalgia in large part on the presence of "trigger points." (A.R. at 41.)

On June 30, 1997, as a supplement to his appeal, Ellis submitted an extensive and detailed report by Phys. Asst. Smith which confirmed that Ellis suffered from fibromyalgia, tinnitus, anxiety, fatigue, stress reaction, and bilateral temporomandibular joint difficulties. (A.R. at 21.) Phys. Asst. Smith specifically diagnosed Ellis as having "trigger points that are classic for fibromyalgia" and stated that Ellis had been disabled from his own occupation since March 14, 1997. (A.R. 22, 23.) On July 9, 1997, a CNA supervisor told the initial reviewer of Ellis's claim to tell El-

lis's counsel that this report was insufficient to change CNA's opinion. (A.R.36.)

CNA issued its ultimate denial of Ellis's appeal on August 12, 1997, without referring either Ellis or the claim file to a physician for an independent examination or review. In the denial letter, CNA gave a detailed summary of Ellis's medical records and then concluded:

> The medical records fail to support the severity of Mr. Ellis' condition that was diagnosed in June 1996, and that suddenly precluded him from working as of March 14, 1997. The medical documentation submitted does not support the severity or decline of Mr. Ellis' health as reported. What is of significance is the fact that Mr. Ellis was informed on January 31, 1997 that his position was being laid off effective March 31, 1997. (A.R. at 32.)

The letter concluded with a statement that "[t]his ruling completes the ERISA review requirements." (A.R. at 33.)

Ellis did not correspond further with CNA until July 15, 1998, when he filed two additional documents and urged CNA to reconsider its decision. (A.R. at 4.) One of the documents submitted was a joint statement by Phys. Asst. Smith and Dr. Pearce regarding Ellis's condition. (A.R. at 6.) The statement reiterated Ellis's numerous diagnoses, declared that Ellis met the American Arthritis Foundation's criteria for fibromyalgia, and emphasized that his medications contributed to his disability by making him dizzy, drowsy, and nauseated. Attached to the statement was a Physical Capacity Assessment completed by Phys. Asst. Smith which outlined significant limitations in Ellis's movement, his speech and hearing, and his ability to sit, stand, and walk for extended periods of time. (A.R. at 11.) According to Phys. Asst. Smith, Ellis was unable to work more than 10 to 15 hours a week, and even then it was unpredictable which days he would be able to do so. (A.R. at 14.)

Ellis also submitted a vocational evaluation prepared by Fred Cutler, a certified rehabilitation counselor. (A.R. at 15.) After reviewing Ellis's medical records, reviewing the statements of Ellis's supervisors at Egghead, and speaking to Ellis himself, Mr. Cutler concluded, "[t]he level of fatigue he experienced with minimal exertion and the absences necessitated would appear . . . inconsistent with a potential to participate in any type of gainful activity." (A.R. at 19.)

CNA did not respond to these additional submissions. On September 14, 1998, Ellis filed suit under 29 U.S.C. § 1132(a)(1)(B).

In March and April 1999, the parties filed cross-motions for summary judgment. On June 14, 1999, this court denied both motions and ordered the parties to submit additional briefing on the proper standard of review under the Plans following the Ninth Circuit's then—new decision in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.1999) (en banc), *petition for cert. filed*, 68 U.S.L.W. 3106 (U.S. July 27, 1999).

Following the additional briefing, this court determined on July 16, 1999, that the proper standard of review under each of the Plans was de novo. As described in detail in this court's opinion on the standard of review, the LTD Plan's language does not confer discretion on CNA. The STD Plan does confer discretion on the plan administrator but this court held that CNA's decision under that Plan was tainted by a conflict of interest. The court reached that conclusion even though the STD Plan is funded by Egghead because if CNA had issued a favorable determination under the STD Plan, CNA itself would have been obligated to pay benefits under the virtually identical provisions of the LTD Plan once 90 days had passed. The court also found that Ellis had presented sufficient additional evidence that CNA's inherent conflict actually tainted its treatment of his claim under the STD Plan.

On July 21, 1999, following a telephonic conference with the parties, this court determined that the medical evidence in front of the court was sufficient to conduct

a de novo review of the claim. However, this court ordered the parties to depose Dr. Pearce and Dr. Sweeney so that the court could make a determination of whether Ellis was "under the regular care of a licensed physician" as required by the Plans. The parties deposed the doctors and have submitted transcripts to the court.

On September 2, 1999, this court held a de novo trial on the record at which counsel presented arguments based on the administrative record and the depositions of the doctors. At trial, the court issued an oral opinion in favor of Ellis. This memorandum opinion supplements the oral opinion.

## II. The De Novo Standard of Review

■ In *Kearney*, an en banc panel of the Ninth Circuit instructed district courts to hold a trial de novo on the administrative record whenever a court determines that the proper standard of review under an ERISA plan is de novo. *See* 175 F.3d at 1094–95. Although the court did not offer specific guidance on how the courts should conduct such a trial, a few things are clear. First, a court should normally restrict its review to the documents in the administrative record. *See id.* at 1094. Second, if the court finds the record insufficiently developed to facilitate an informed de novo review, the court has the discretion to consider additional evidence. *See id.* at 1095. If necessary, the court can go so far as to appoint an expert. *See Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1070–71 (9th Cir.1999). Third, once the record is set, the court's review must focus on "whether [the claimant] is disabled within the terms of the policy." *See Kearney*, 175 F.3d at 1095.

*Kearney* does not, however, expressly indicate whether the court must put itself in the position of the plan administrator and restrict any additional evidence to interpretations of the record instead of substantive additions to it. At trial, the parties were clearly divided on this issue, largely because the record in front of the court includes documents that Ellis submitted to CNA several months after CNA had completed the ERISA review process. Defendants contend that the court may not consider the 1998 documents because they were not part of the ERISA review process and do more than simply clarify the record for the court.

However, *Kearney* does not require a district court, in a de novo trial, to always assume the same position that the plan administrator was in when it made its decision, nor does it restrict additional evidence as Defendants contend it does. Although *Kearney* states that "in most cases" courts should consider "only the evidence that was before the plan administrator," 175 F.3d at 1091, *citing Mongeluzo v. Baxter Travenol Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir.1995), it is also clear that the court may expand the pool of evidence as necessary to allow an informed de novo review. *See Kearney*, 175 F.3d at 1095. Nowhere does *Kearney* (or *Mongeluzo*, for that matter) restrict the court's discretion in considering additional evidence that does more than merely interpret the record before the administrator.

Defendants nonetheless contended at trial that *Walker* restricted the *Mongeluzo/Kearney* standard to allow only interpretive evidence. In that case, the district court appointed an expert to assist the court in its de novo review of a complex and contradictory administrative record. *See* 180 F.3d at 1068. The Ninth Circuit affirmed the appointment but, contrary to what Defendants argue, did not hold that all additional evidence must be interpretive rather than substantive. The court merely restated the *Mongeluzo/Kearney* rule that any additional evidence must be "necessary to conduct an adequate de novo review of the benefit decision." *Walker*, 180 F.3d at 1070. This court finds that statement to be the only restriction on the evidence it may consider in a de novo review. *See id.* at 1070–71.

■ The documents Ellis submitted to CNA after CNA denied his appeal are necessary to conduct an adequate review of Ellis's eligibility for benefits. Unlike CNA, which faced only the question of whether Ellis was disabled as of March 14, 1997, this court must also determine whether Ellis has remained disabled and was disabled from working in "any occupation" as of June 1999. The two 1998 reports are the only documents that address whether Ellis has remained disabled and in particular whether he is disabled from working in any occupation.

This court also notes that the 1998 documents are in front of the court only because Defendants filed them as part of the administrative record. On February 8, 1999, Defendants filed with this court a stack of documents labeled "ERISA Administrative Record" which arrived under a cover that stated the documents constituted "the Administrative Record for Plaintiff's claims for benefits." (Court Record 11.) The documents included the 1998 documents described earlier in this opinion. This submission is tantamount to an admission. Because Defendants have not requested to amend the filing and have not attempted to explain why they filed the 1998 documents if they in fact were not part of the record, this court deems Defendants to have admitted that they are part of the record. *See Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir.), *cert. denied*, 516 U.S. 861, 116 S.Ct. 170, 133 L.E.2d 111 (1995).

The record, then, consists of the entire administrative record as filed by Defendants and the depositions ordered by this court. It does not include a series of letters between Ellis and Egghead that Ellis has sought to add to the record. The letters consist primarily of discussions about whether Egghead was the plan administrator and whether the Plans grant the plan administrator abuse of discretion review. They were not in front of CNA and they are not necessary to allow this court to determine whether Ellis is disabled. They therefore do not constitute part of the record for review.

## III. The Court's De Novo Review

As discussed earlier, this court's task is to determine whether the record establishes that Ellis is "disabled" within the meaning of the Plans. By virtue of the fact that the STD Plan and the first 24 months of benefits under the LTD Plan use an "own occupation" standard, while the LTD Plan institutes an "any occupation" standard after 24 months, this court must review the evidence separately for each standard.

### A. The STD Plan and the First 24 Months of the LTD Plan Benefits

In order to receive benefits under the STD Plan and the initial 24 months of benefits under the LTD Plan, a participant must be unemployed, under the regular care of a licensed physician, and unable to work in his own occupation. The parties do not dispute that Ellis has not worked since leaving Egghead on March 14, 1997. They do contest the other two elements.

#### 1. *Was Ellis Under the Regular Care of a Licensed Physician?*

■ According to Defendants, Ellis is not entitled to benefits, even if he was unable to work as of March 1997, because he was not under the regular care of a licensed physician. As Defendants correctly point out, Phys. Asst. Smith, who is not a licensed physician, administered most of the treatment for Ellis's fibromyalgia and other conditions. Defendants contend this was insufficient under the terms of the Plan.

Ellis argues that the court should not consider this argument because CNA did not raise the issue when it denied Ellis's claim. As Ellis points out, in *McCoy v. Federal Insurance Co.*, 7 F.Supp.2d 1134, 1145 (E.D.Wa.1998), this court determined that the defendant had waived its right to raise an argument when 1) it had the opportunity to raise it during the ERISA review process but did not do so; 2) the plaintiff did not acquiesce in the defendants' raising of the issue; and 3) the plan

language gave rise to de novo review. All three elements are present here—Defendants could have raised it but did not, Ellis has repeatedly objected to the argument of the issue in this court, and the standard of review in this case is de novo. This court agrees that Defendants waived the argument when CNA failed to raise it during the review process.

█ Yet even if Defendants had not waived the argument, the court would still find in Ellis's favor on this issue. The court ordered the parties to depose both Dr. Pearce and Dr. Sweeney on precisely this question and both stated that while Phys. Asst. Smith performed most of the initial screening, his treatment of Ellis was under their direct supervision. Dr. Pearce reviewed and initialed the records of Ellis's visits with Phys. Asst. Smith, examined Ellis personally on at least one occasion, and in 1998 issued a joint report with Phys. Asst. Smith regarding Ellis's condition. Dr. Sweeney also personally examined Ellis and supervised Phys. Asst. Smith's treatment of Ellis. Both Dr. Pearce and Dr. Sweeney also testified that they agreed with Phys. Asst. Smith's opinions.

Defendants, despite arguing this point, have not offered any evidence that supports their position. Dr. Pearce and Dr. Sweeney both testified that Ellis was under their regular care by means of direct supervision. This court finds that Ellis was under the regular care of a licensed physician.

2. *Was Ellis Disabled From Working in His Own Occupation?*

█ The second contested point, of course, is whether Ellis was disabled from working in his regular occupation with Egghead as of March 14, 1997. The record establishes that Ellis's job was extremely demanding, both physically and mentally. Ellis traveled frequently to the sites of new Egghead stores where he was required to work 14–hour days for 4 to 5 days in a row in order to meet tight construction deadlines. Ellis carried the fix-

tures to the site, both by hand and with the use of heavy machinery, and then installed them. His job required him to be alert and physically fit for extended periods of time.

The record is replete with evidence that Ellis was afflicted with fibromyalgia and that it rendered him unable to perform this job. The Ninth Circuit has described fibromyalgia as follows:

Fibromyalgia is a form of rheumatic disease with no known cause or cure. The principal symptoms, which are entirely subjective, are pain and tenderness in muscles, joints, and ligaments, but the disease is frequently accompanied by fatigue, sleep disturbances, anxiety, dizziness, irritable bowels and tension headaches.... Stress is both a symptom of fibromyalgia and an exacerbating factor.

*Walker*, 180 F.3d at 1067, *citing* Arthritis Foundation Pamphlet, *Fibromyalgia*, 6–8 (1989). *See also Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794, 796 (9th Cir.1997).

Ellis repeatedly presented himself with these symptoms and his treating medical professionals repeatedly diagnosed him as having severe fibromyalgia. Ellis first reported problems with his back and bowels in February 1996. By June 1996, his condition had worsened and Phys. Asst. Smith diagnosed fibromyalgia. Over the rest of that year, he repeatedly visited the Rockwood Clinic with symptoms straight out of those listed by the Ninth Circuit as indicative of fibromyalgia—bowel problems, joint and muscle pain, fatigue, anxiety, and heightened stress. Dr. Pearce, Dr. Sweeney, and Phys. Asst. Smith all agreed in 1996 that Ellis suffered from fibromyalgia, and in August 1996, Phys. Asst. Smith specifically noted that Ellis had the "trigger points" commonly associated with the disease.

The medical records document symptoms that would undoubtedly interfere with a high-pressure, physical job such as Ellis's. While his position at Egghead re-

quired continuous physical activity, an ability to remain alert, and long periods of work and travel without rest, Ellis was constantly fatigued, unable to perform the physical tasks required by his job, and unable to do any part of his job for more than three hours without resting for a substantial amount of time. Ellis's supervisors indicated that he was unable to perform the regular duties of his job as early as the spring of 1996. By September 1996, Egghead was forced to hire a contractor to perform the tasks Ellis could not complete. Phys. Asst. Smith stated that as of March 14, 1997, Ellis was "completely disabled from his duties of his regular occupation ... due to the significant fatigue and inability to continuously perform any of the tasks in both [his] office work and support work." (A.R. at 23.)

CNA has not offered any medical evidence to the contrary. Despite the fact that Ellis's physicians clearly diagnosed fibromyalgia and stated that it disabled him under the terms of the Plans, CNA did not refer Ellis or Ellis's file to a physician for an independent examination or review. Instead, CNA simply stated in its denial letters (and at trial) that Ellis's medical records did not establish that Ellis had a disability. If the standard of review under the Plans was for an abuse of discretion by the plan administrator, this court would find that CNA's behavior constituted an abuse of discretion. *See, e.g., Zavora v. Paul Revere Life Insurance Co.,* 145 F.3d 1118, 1122–23 (9th Cir.1998) (administrator abused its discretion when it referred the claim file to an in-house physician who rejected the conclusion of the claimant's doctors without offering contradictory evidence).

As it is, this court has determined that the proper standard of review under the Plans is de novo and now holds that Ellis is entitled to full benefits under the STD Plan and the first 24 months of benefits under the LTD Plan. The evidence Ellis submitted to CNA before the review process closed clearly establishes that as of March 14, 1997, Ellis was disabled by fibromyalgia and that his disability kept him from working in his regular occupation. The uncontested medical records show that Ellis suffered from the symptoms that are indicative of fibromyalgia, including trigger points. The records also establish that his symptoms were so severe they prevented him from performing key elements of his job.

The court rejects Defendants' argument that Ellis was not disabled as of March 1997 and that he exaggerated his condition upon learning he would be laid off on March 31, 1997. According to Defendants, the timing of Ellis's application for benefits is simply too convenient to constitute a coincidence. Ellis learned in January 1997 that he would be laid off. He completed his application in February and stopped work in March just over two weeks before his anticipated layoff date. Defendants claim that this sequence of events casts all of the medical records into doubt because none of the pre-February 1997 medical records mention the words "disabled" or "disability."

Defendants offer the court nothing other than dates and unsupported insinuations to substantiate their argument. The administrative record does not show that Ellis fabricated his claim. In fact, the record could just as easily be read to support the argument that Ellis was chosen for layoff because he was unable to perform his job. Neither reading, however, constitutes anything more than conjecture about the interaction of Ellis's disability and his projected layoff.

Nor does the fact that Ellis's health care providers never mentioned "disabled" or "disability" render his medical records incapable of supporting his benefit claim. The records show that throughout 1996, Dr. Pearce, Dr. Sweeney, and Phys. Asst. Smith were attempting to treat and diagnose Ellis's condition and its various symptoms. The records also document a steady decline in Ellis's health. Without mentioning the word "disability," the records establish that Ellis was suffering from fibromyalgia symptoms that were

simply incompatible with his job. Accordingly, he is entitled to benefits under the STD Plan and the first 24 months of benefits under the LTD Plan, as well as prejudgment interest on those benefits.

### 3. *Is Ellis Disabled from Working in Any Occupation?*

■ After receiving 24 months of benefits under the LTD Plan, a participant must be disabled from working in "any occupation" in order to receive additional benefits under that Plan. For Ellis, the initial 24–month period expired in June 1999. Therefore, this court must determine if Ellis is entitled to additional benefits.

The administrative record is relatively quiet on this issue. As discussed earlier, the records and reports submitted to CNA in 1997 focused on whether Ellis could continue to work in his position at Egghead, and not whether he would be disabled from any occupation as of June 1999. However, the documents Ellis submitted to Egghead in July 1998 establish that Ellis meets the LTD Plan's "any occupation" standard.

The evaluation prepared and signed by Dr. Pearce and Phys. Asst. Smith in May 1998 and the June 1998 clarification by Phys. Asst. Smith establish that Ellis is unable to work. According to these reports, Ellis suffers from eight different conditions, including fibromyalgia, that incapacitate him every day for an average of 3 to 4 hours. Although he has 1 to 2 days per week that are better than the rest, he could probably manage no more than 10 to 15 hours of work per week. Apparently there is no way to predict which days or hours he will feel better.

The reports establish that he can walk for only a half-hour at a time, can sit and stand for only an hour at a time, and can only occasionally lift or carry weight up to 50 pounds. Ellis can only sporadically perform the most basic physical acts, such as bending, pushing, and grasping. He has severe tinnitus that limits his ability to hear and significant jaw problems that lim-

it his ability to speak. In addition, his medication makes him dizzy, drowsy, and nauseated and causes him to have headaches and gastrointestinal problems.

Mr. Carson, who performed Ellis's June 1998 vocational evaluation, carefully reviewed this medical evidence, Ellis's past work history, and statements made by Egghead. Mr. Carson concluded in his report that the conflagration of Ellis's symptoms and his need for excessive absences render him unable to "participate in any type of gainful activity." (A.R. at 19.)

These documents establish that Ellis has been disabled from all occupations for more than a year. When they are read together with the earlier medical records and reports, the following picture emerges: a man who is continuously drowsy and fatigued, unable to concentrate, unable to perform the most simple physical tasks, unable to stand, sit, or walk for more than an hour at a time, unable to work more than 15 hours per week, and unable to predict which hours he will be available, if at all. This court cannot imagine any occupation that such a person could fill successfully, much less an employer who would be willing to hire him.

The court finds that the record establishes that Ellis has been disabled from working in any occupation since at least May 1998. It was undisputed at trial that Ellis's condition has not improved. Therefore the court finds that Ellis is entitled to receive benefits under the LTD Plan beyond the initial 24–month period so long as Ellis remains disabled from working in any occupation or until his benefits otherwise terminate according to the terms of the LTD Plan. This court further holds that Ellis is entitled to prejudgment interest on those benefits.

### IV. Conclusion

Upon de novo trial on the administrative record, this court holds that Ellis is disabled under the terms of both the STD Plan and the LTD Plan. Ellis shall be entitled to continue to receive benefits un-

der the LTD Plan until such time as he is no longer disabled from working in any occupation or his benefits otherwise terminate according to the terms of that Plan. Ellis is entitled to prejudgment interest on all past benefits. In addition, this court awards Ellis reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g). The parties are hereby ORDERED to confer regarding the amount of the benefits, interest, fees, and costs and submit to this court, no later than October 1, 1999, a summary of the calculation of the total award.