**Joyce A. CASTLE, Plaintiff,**

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY,
Defendant.**

**No. C–3–97–211.**

United States District Court,
S.D. Ohio,
Western Division.

Jan. 16, 2001.

William Oak Cass, Jr., Dayton, OH, for plaintiff.

Jeffrey C. Mando, Adams Stepner Woltermann & Dusing, Covington, KY, for defendant.

DECISION AND ENTRY FINDING DEFENDANT'S FINAL DECISION DENYING PLAINTIFF'S CLAIM FOR LONG–TERM DISABILITY BENEFITS UNDER ERISA PLAN TO BE ARBITRARY AND CAPRICIOUS; DEFENDANT DIRECTED TO AWARD PLAINTIFF RETRO-ACTIVE LONG–TERM DISABILITY BENEFITS BEGINNING ON DATE HER 180–DAY ELIMINATION PERIOD EXPIRED, AND CONTINUING UNLESS AND UNTIL SUCH TIME AS DEFENDANT FINDS PLAINTIFF TO BE NO LONGER TOTALLY DISABLED; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT; TERMINATION ENTRY

RICE, District Judge.

■ This matter comes before the Court upon the Plaintiff's appeal from the Defendant's denial of her claim for long-term disability benefits under an ERISA plan. In a September 9, 1998, Decision and Entry (Doc. # 24), the Court overruled the Defendant's Motion for Summary Judgment (Doc. # 16), concluding that Fed.R.Civ.P. 56 is an inappropriate mechanism for resolving a challenge to a plan administrator's denial of ERISA plan benefits. *See, e.g., Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (6th Cir.1998). The Court recognized that, when reviewing a plan administrator's denial of benefits, a district court ordinarily may consider only evidence that the administrator considered when reaching a final decision on the claim. *Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1376 (6th Cir.), *cert. denied,* 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994). Given its inability to conduct an evidentiary hearing or a bench trial in this matter, the Court explained that it would render a decision, based on its review of the record that was before the plan administrator. (Doc. # 24 at 4–5). Having conducted such a review, the Court concludes, for the reasons set forth more fully, *infra,* that the plan administrator acted arbitrarily and capriciously in denying the Plaintiff's claim for plan benefits.[1] As a result, the Plaintiff is

---

1. Although the Plaintiff's amended Complaint is divided into three counts, each count seeks

entitled to receive long-term disability benefits under the terms of her ERISA plan.

## I. *Factual Background* [2]

Plaintiff Joyce A. Castle formerly worked as a master finisher for Advertising Display Company, which is located in Dayton, Ohio. Her specific responsibilities included, inter alia, operating and repairing various pieces of equipment, bundling, packing, writing labels and making quality-control decisions. (Doc. # 16, Exh. B at 85–86). A written job description states that master finishers must be able to "stand on feet ten (10) hours per day" and "[b]e able to lift twenty-five (25) pounds." (*Id.* at 86). While employed by Advertising Display Company, Castle was covered under a group long-term disability insurance policy issued to her employer by Defendant Reliance Standard Life Insurance Company. (*Id.* at Exh. A). The parties agree that the policy qualifies as an "employee welfare benefit plan," as that phrase is defined in the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* Among other things, the

policy provides for long-term disability benefits to be paid when an insured:

(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy;

(2) is under the regular care of a Physician;

(3) has completed the Elimination Period; and

(4) submits satisfactory proof of Total Disability to us.

(Doc. # 16, Exh. A at 8.0).

The Reliance Standard policy defines "Elimination Period" to mean "a period of consecutive days of Total Disability . . . for which no benefit is payable. It begins on the first day of Total Disability." (*Id.* at 2.0). The policy defines "Totally Disabled" and "Total Disability" to mean that "as a result of an Injury or Sickness"

(1) during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation; and

recovery of the same ERISA plan benefits under 29 U.S.C. § 1132. In Counts I and II, the Plaintiff contends that the Defendant breached its fiduciary duty under 29 U.S.C. § 1104(a)(1) by denying her claim for plan benefits. Consequently, she seeks to recover those plan benefits under 29 U.S.C. § 1132. (Doc. # 9 at ¶ 9–17). In Count III, the Plaintiff brings a straight claim for ERISA plan benefits, presumably under 29 U.S.C. § 1132(a)(1)(B). (*Id.* at ¶ 18–20). The relief available for a breach of the fiduciary duty imposed by § 1104(a)(1) can be found in 29 U.S.C. § 1132(a)(3). *Allinder v. Inter–City Products Corp. (USA)*, 152 F.3d 544, 550 (6th Cir.1998). In *Wilkins*, the Sixth Circuit noted that § 1132(a)(3) is a "catchall provision" which does not apply when a plaintiff is capable of pursuing relief under any other portion of § 1132. *Wilkins*, 150 F.3d at 615. In particular, the *Wilkins* court held that a plaintiff has no claim under § 1132(a)(3) when he or she is capable of pursuing relief under § 1132(a)(1)(B) to challenge a plan adminis-

trator's denial of a claim for benefits. *Id.* In the present case, Count III of the Plaintiff's Complaint arises under 29 U.S.C. § 1132(a)(1)(B) and challenges Reliance Standard's denial of her claim for long-term disability benefits. Given that § 1132(a)(1)(B) provides a specific remedy for the Plaintiff's alleged injury, she "does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)." *Id.* Consequently, the present action is nothing more than a straight claim for ERISA plan benefits under § 1132(a)(1)(B), and the Court will analyze it as such.

2. The Court's recitation of the facts and its subsequent analysis are based exclusively upon the evidence that was before the plan administrator when it reached a final decision on the Plaintiff's claim for disability benefits. In its analysis, *infra*, the Court will set forth additional facts from the administrative record, as necessary.

(2) for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation . . .

(3) after a Monthly Benefit has been paid for 36 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a[f]ull-time basis.

(*Id.* at 2.1).

Sometime between November 28, 1995, and February 22, 1996, Castle filed a claim for long-term disability benefits under her Reliance Standard plan.[3] (*Id.* at Exh. B, p. 137). In her application, Castle described her earliest symptoms as "pain and swelling and not able to walk." She stated that she had first noticed the symptoms in 1993 after injuring herself at work. (*Id.*). She identified ankle swelling and an inability to walk without pain as the reasons why she could no longer work. (*Id.*). In connection with Castle's disability insurance claim, her employer submitted a written statement to Reliance Standard, noting that her "[j]ob requires standing." (*Id.* at 141). Her attending physician, Dr. Dixie Dooley, also submitted a written statement to Reliance Standard. (*Id.* at 143). In his November 28, 1995, statement, Dr. Dooley identified Castle's symptoms as left heel pain, and he provided a diagnosis of heel spurs and plantar fascitis. (*Id.*). As of that date, Dr. Dooley reported that Castle

could not stand or walk at all during an eight-hour work day. (*Id.* at 144). He also noted that he expected her to achieve "maximum medical improvement" in approximately three to four months. (*Id.*). He did not define that phrase, however, and he did not indicate when he expected her to be able to return to work. (*Id.*). Thereafter, Castle visited Dr. Dooley and other doctors on numerous occasions. She also received treatment from two physical therapists.[4]

After obtaining information from various health care providers, Reliance Standard denied her claim for long-term disability benefits on April 12, 1996. In a letter to Castle, a claims examiner set forth the following reasoning in support of the company's decision:

> . . . Review of your current medical information about your condition from Allied Physical Therapy Services and Dr. Dooley indicates that you were able to return to work on February 16, 1996. Allied's treatment note of February 15, 1996[,] documents no pain in the left lower extremity, and that you were ambulating without a limp or a cane. It was also noted that you were able to negotiate stairs without difficulty. You were discharged from physical therapy on that date. Dr. Dooley's office note of March 5, 1996[,] indicates you were doing much better.
>
> Your group policy states that no benefits are payable for the first 180 days of disability. . . . Because you first became unable to perform your occupation on September 28, 1995, your 180 day elimination period would end on March 27, 1996. You would be eligible for benefits

---

3. The parties dispute the date on which Castle filed her claim. For purposes of the Court's analysis herein, however, the specific date that she did so is immaterial.

4. The nature of Castle's medical treatment will be set forth more fully, *infra*, in the Court's analysis.

only if you remained disabled after March 27, 1996, and met the remaining requirements of your group policy. Based on the available medical documentation, you were not disabled, as defined by the group policy, after February 15,1996, and are not eligible for benefits and your claim has been denied. This claim determination reflects an evaluation of the claim facts and policy provisions. We reserve the right to make a determination on any additional conditions that may be submitted. . . .

(*Id.* at 80).

Castle appealed the denial of her claim to Reliance Standard's Quality Review Unit, which upheld the claims examiner's decision to deny her long-term disability benefits. In a December 27, 1996, letter to Castle's attorney, a Reliance Standard representative explained the basis for the denial as follows:

... According to Dr. Dooley's records, Ms. Castle has a requirement to attend physical therapy two or three times per week. The records of February 15, 1996[,] stated that Ms. Castle had little or no edema, she was ambulating without the aid of a cane, and she walked without a limp. In addition, she was able to ambulate the stairs without a problem., [sic] and was released from Physical Therapy because of her continued progress.

Ms. Castle's group policy which provides long term disability benefits through the Advertising Display Company, has an elimination period of 180 days, which ended on March 29, 1996. Even though Dr. Dooley has stated that Ms. Castle was not released to return to work on or about the 15th of February, 1996, there is no objective evidence and no x-ray reports or testing records presented beyond that date which show that Ms. Castle is still considered disabled and unable to perform the material duties of her regular occupation.

Given these facts, we must uphold the denial of long term disability benefits because we do not have objective medical evidence to show proof of continuing disability beyond the elimination period. I am sorry this review could not have been more favorable. Please note that the review was considered in an objective manner and all available medical documentation was used to make this determination.

(*Id.* at 11–12).[5]

On March 26, 1997, Castle filed suit in state court, challenging the denial of her claim for long-term disability benefits. Her two-count Complaint alleged bad faith refusal to pay and breach of contract. Reliance Standard removed the action to this Court on May 5, 1997, alleging complete preemption under ERISA and diversity of citizenship. (Doc. # 1). Thereafter, Castle filed an amended Complaint (Doc. # 9), re-pleading her claims in the language of ERISA rather than state law. As set forth above, Reliance Standard subsequently filed a Motion for Summary Judgment (Doc. # 16). The Court overruled the Motion on September 9, 1998, without addressing the company's arguments. (Doc. # 24). Rather than determining whether a genuine issue of material fact existed,[6] the Court informed the parties

---

5. In its initial letter denying Castle's claim, Reliance Standard stated that her elimination period would have expired on March 27, 1996. (Doc. # 16, Exh. B at 80). Thereafter, in its letter denying her appeal, the insurance company stated that her elimination period

would not have expired until March 29, 1996. (*Id.* at 11). For present purposes, this two-day difference is immaterial.

6. *See Wilkins,* 150 F.3d at 619 ("Because this court's precedents preclude an ERISA action

that it would review their arguments, in light of the administrative record, and render a decision on the merits of the Plaintiff's claim for ERISA plan benefits.

## II. Analysis

■ As a means of analysis, the Court first must determine the proper standard of review to apply to the plan administrator's denial of the Plaintiff's claim for long-term disability benefits. It is well settled that a plan administrator's denial of benefits should be reviewed de novo, unless the plan gives the administrator discretionary authority to determine a claimant's eligibility for benefits. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996). In the present case, the Plaintiff's disability insurance policy required her to submit "satisfactory proof of Total Disability to us" (i.e., to the Defendant). (Doc. # 16 at Exh. A). The Sixth Circuit has held that this language provides a plan administrator with the discretion to determine a claimant's eligibility for benefits. *Yeager*, 88 F.3d at 381; *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555–558 (6th Cir.1998). Therefore, the Court must apply "the highly deferential arbitrary and capricious standard" when reviewing the denial of Castle's claim. *Yeager*, 88 F.3d at 380. This standard "is the least demanding form of judicial review.... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 242 (6th Cir.1995) (internal quotation marks and citations omitted). With the foregoing

standard in mind, the Court turns now to the merits of this action.

■ The issue before the Court is whether Reliance Standard acted arbitrarily and capriciously when it denied Castle's claim for long-term disability insurance benefits. The parties have provided the Court with a complete copy of the administrative record available to Reliance Standard on December 27, 1996, when it made the final decision to deny Castle's claim for plan benefits. In order to determine whether the insurance company's denial of Castle's claim was arbitrary and capricious, the Court first will review, in some detail, the evidence that was before the plan administrator.

### A. *Content of Administrative Record*

The administrative record reflects that Castle first consulted a podiatrist, Dr. Dixie Dooley, on March 29, 1995, complaining of "discomfort" in her left foot. (Doc. # 16, Exh. B at 17). Dr. Dooley took x-rays, which depicted "maximum pronation with osteophytic lipping." [7] (*Id.*). The doctor's notes reflect that Castle returned on April 19, 1995, exhibiting a "bad limp" and complaining about "a lot of discomfort." (*Id.*). In response, Dr. Dooley placed her in a "flex cast" and "boot." (*Id.*). Castle returned on April 21, 1995, with additional complaints of "severe discomfort" on the "plantar aspect of the left foot." (*Id.* at 18). Dr. Dooley examined Castle and noted no redness, irritation, erythema, denotation of infection or severe inflammation. (*Id.*).

After undergoing physical therapy, Castle saw Dr. Dooley again on April 24, 1995.

---

from being heard by the district court as a regular bench trial, it makes little sense to deal with such an action by engaging a procedure designed solely to determine 'whether there is a genuine issue for trial.' ").

7. The term "lipping" refers to "the development of a bony overgrowth in osteoarthritis." Dorland's Illustrated Medical Dictionary (28th Ed.1994) at 951.

She reported feeling "quite better," but still complained of "some pain in and about the medial portion of the left calcanei." (*Id.* at 17). At that time, Dr. Dooley decided to treat her for plantar fascitis.[8] (*Id.*). Among other things, the doctor removed Castle "from her long-term walking and standing job activities for 2 weeks." (*Id.*). Castle returned for a check-up on May 2, 1995, and reported continued improvement in her heel pain. (*Id.* at 18). Thereafter, she returned on May 17, 1995, still complaining about heel pain, which Dr. Dooley treated with a cortisone injection. (*Id.*). She saw the doctor again on May 25, 1995, with additional complaints of discomfort. Dr. Dooley's notes for that visit state, in relevant part:

... I am quite concerned with Joyce's progress. There has been no improvement in her case. We have now seen the patient on six various occasions, tried various anti-inflammatories, injectables, and PT. She has yet to respond to the point where she can resume her work activity which constitutes long-term standing and walking for eight to 10 to 12 hour durations.

(*Id.* at 18).

Thereafter, Dr. Dooley referred Castle to another physician, Dr. Sunschein, for a second opinion. When she returned to his office for a follow-up examination on June 27, 1995, Dr. Dooley entered the following remarks into her record:

I had received a consultation report from Dr. Sunschein, and I had also spoken to him personally at the hospital concerning his second opinion of Joyce's condition. He did feel that a BK cast nonweight bearing was indicated. I have extreme trepidation concerning this therapy. I have a feeling that this young lady due to the traumatic incidents, time of life, and several other influencing conditions [this treatment] could possibly lead this individual to a causalgia problem,[9] which I feel would be worse than her heel pain. I have therefore declined to move towards use of the BK casting at this time and I am going to move towards further diagnostic testing[,] including MRI....

(*Id.* at 19).[10]

Dr. Dooley saw Castle again on July 11, 1995, regarding what the doctor described as a "rather recalcitrant complaint of ankle and/or heel pain." (*Id.*). The doctor performed a bone scan, which "li[t] up in several areas." (*Id.*). On her next visit, which occurred on August 31, 1995, Castle informed Dr. Dooley that her left heel was feeling "somewhat better," but that she was experiencing pain in her right knee. (*Id.*). After that visit, Dr. Dooley released Castle to return to work. (*Id.*). Approxi-

8. *See Hoag v. Brown*, 4 Vet.App. 209, 211 (1993) ("Fascitis is defined as 'inflammation of a fascia'; a fascia is 'a sheet of connective tissue covering or binding together body structures.' WEBSTER'S MEDICAL DESK DICTIONARY 236 (1986).... Plantar fascitis is defined as 'inflammation involving the plantar fascia esp[ecially] in the area of its attachment to the calcaneus and causing pain under the heel in walking and running.' WEBSTER'S at 552.").

9. The term "causalgia" has been defined as a "[p]ersistent severe burning sensation of the skin, usually following direct or indirect (vas-cular) injury of sensory fibers of a peripheral nerve, and accompanied by cutaneous changes (temperature and sweating)." Stedman's Medical Dictionary (5th Unabridged Lawyers' Edition 1982) at 238; *see also Wyatt v. Finch*, 340 F.Supp. 818, 822 (W.D.Va.1972) ("Causalgia is defined as a burning sensation or pain, especially in the palms and soles, caused by injury to the nerves which carry impulses from these parts. In some cases, the skin undergoes deteriorative changes.").

10. The administrative record does not indicate whether an MRI was performed.

mately two weeks later, she returned and complained of "burning about the medial aspect [of the] left heel." (*Id.* at 20). Dr. Dooley expressed his belief that her ten-hour days at work were causing "too much overuse syndrome." (*Id.*). A week later, Castle saw the doctor again and complained of continued "pain in and about the left heel." At that time, Dr. Dooley took her off of work again, "due to long-term walking and standing." (*Id.*).

She then consulted a different physician, Dr. McKinney, for another opinion about her condition. Following an October 5, 1995, visit, Dr. McKinney placed the following remarks in her record:

> ... I was asked for a second opinion consultation regarding persistent heel pain on the left heel. In review of the notes, a full gamut of conservative measures ha[s] failed in rendering her symptom free. A technetium bone scan on June 27, 1995, did light up an inferior aspect of the calcaneus. X-rays do show marked spurring [11] inferiorly in several places, and also reveal a somewhat lowered arch, although not too hateful [of a] structural alignment. The contralateral asymptomatic side has similar spurring. She describes burning and pins and needles and swelling. She relates it to a fall in August of 1993 when she stepped on a loose concrete slab and fell.... On examination she was nontender to percussion of the tarsal tunnel region. She did have a swollen abductor hallucis muscle belly.... Her pain was well localized to the inferior aspect of the tubercle of the calcaneus at the insertion of the plantar fascia. She was dramatically positive on the medial and lateral compression test. That coupled with a positive bone scan leads me to a high

index of suspicion of a covert stress fracture. (*Id.* at 23).

Thereafter, Castle visited Dr. Dooley for a follow-up examination on December 7, 1995, still complaining about experiencing pain. (*Id.* at 22). In response, the doctor placed her in a walking cast. (*Id.*). She then saw Dr. McKinney again on December 14, 1995, complaining about the cast, heel pain and a burning sensation. (*Id.*). Castle remained in the cast until her January 17, 1996, follow-up visit with Dr. Dooley. In the course of that visit, during which he removed the cast, she complained about "still having intermittent discomfort present in the heel." (*Id.* at 24).

Dr. Dooley saw her again on January 22, 1996, and directed her to undergo physical therapy. (*Id.*). On January 25, 1996, Castle visited Cindy Winkeljohn, a physical therapist, who noted "symptoms and findings consistent with post cast syndrome on the left." (*Id.* at 31). In particular, Winkeljohn observed "edema of the left foot and ankle, coolness in the left calf and foot and tissue tenderness at the left medial superior tibial region." She also noted that "[l]eft ankle mobility and strength are both limited." (*Id.*).

Dr. Dooley saw Castle again on February 8, 1996. At that time, she stated that her heel felt much better, she reported no burning sensations and she walked with less of a limp. (*Id.* at 24). The doctor directed her to continue with physical therapy, and she reported back to Winkeljohn, who ultimately discharged her on February 15, 1996. In her discharge summary, Winkeljohn reported:

> Joyce was seen in physical therapy five times for treatment of post cast syn-

---

11. A "spur" is "a projecting body, as from a bone." A "calcaneal spur" is "a bone excrescence on the lower surface of the calcaneus which frequently causes pain on walking." *Dorland's Illustrated Medical Dictionary* (28th Ed.1994) at 1566.

drome.... Today Joyce reports that she is no longer having any pain in the left lower leg, ankle or foot. She is ambulating without a limp and without a cane. She is able to negotiate stairs without difficulty. There is no tenderness over the plantar aspect of the left foot. Slight edema is still noted in the ankle.... Joyce is pleased with her progress and feels she will have no trouble continuing her exercises at home....

(*Id.* at 33).

Thereafter, on March 5, 1996, Castle returned to Dr. Dooley and reported "mild discomfort present in the left heel." The doctor noted that she was "[d]oing much better" and "[n]ot limping as much." He also noted, however, that Castle had some ankle instability and some weakness, and she reported still limping and getting tired at the end of each day. (*Id.* at 24). He recommended the use of orthotic devices and scheduled her for a follow-up appointment. (*Id.*).

On March 13, 1996, Dr. Dooley set forth his view of Castle's condition in the following correspondence, which he addressed "To Whom It May Concern:"

... As Joyce presented herself she had traumatic injury to the origin of the left plantar fascia and this particular injury has been particularly resistant to conservative treatment.

Joyce has been seen in the office greater than 15 times throughout her present treatment. Her last visitation at the office was March 5, 1996, at which point Joyce was doing better with her left heel, but still was having remissions and exacerbations of the complaint. She at this point complained of ankle instability, that there was a weakness present, and that there was still intermittent pain in and about the origin of the left plantar fascia in the left calcaneus. Throughout Joyce's treatment which we have described in the number of visitations, treatments have been inclusive of cortisone injections, nonsteroidal anti-inflammatories, oral corticosteroid compounds, extensive physical therapy inclusive of manipulation, and below knee casting for up to three months. This has rendered Joyce's complaint considerably better, but she still states she does have some discomfort and inability to perform long-term walking and standing.

Joyce has from the onset been concerned about returning to work, however, her job description appears to me to require long-term walking and standing which I feel Ms. Castle may not have further abilities to perform due to this injury and several musculoskeletal abnormalities noted within the foot structure.

The above narrative has been dictated in an effort to define for you Joyce's diagnosis of plantar fascitis to the left heel, her treatments which I described on a number of visitations, and general practice guideline.

I am certainly not an expert to define disabilities within the workplace, however, it is my opinion that Ms. Castle is going to have a difficult time in returning to the job force in performing long-term walking and standing activities....

(*Id.* at 37–38).

Thereafter, on April 1, 1996, Cindy Winkeljohn completed a "Physical Capacities Form" at the request of Reliance Standard. In that form, she expressed her opinion that, as of February 15, 1996, Castle was capable of standing for only one to three hours per day, and working eight hours per day "while sitting." (*Id.* at 90). She also expressed her belief that Castle could lift a maximum of ten pounds. (*Id.*). After receiving Winkeljohn's report,

a Reliance Standard claims examiner denied Castle's application for long-term disability benefits on April 12, 1996. (*Id.* at 80). The examiner informed Castle that a "[r]eview of current medical information about your condition from Allied Physical Therapy Services and Dr. Dooley indicates that you were able to return to work on February 16, 1996." (*Id.*).

Shortly thereafter, on April 16, 1996, physical therapist Charles Miller prepared an evaluation of Castle for Dr. Dooley. In that report, he noted Castle's complaints of edema in her left ankle and foot after prolonged standing and walking. He also noted that Castle's chief complaint at that time was right knee pain. (*Id.* at 53). Based on his examination of Castle, Miller opined as follows:

> Joyce appears to have developed pes anserine tendonitis and bursitis about the right knee which could be secondary to her abnormal gait patterning which was present with her left ankle complaints. At this time her only left ankle finding is that of edema, though no pain complaints are noted....

(*Id.* at 52). Miller subsequently discharged Castle on May 9, 1996. In a discharge summary to Dr. Dooley, he stated:

> Joyce has received six treatments oriented towards her right knee pain. She has had changes in her symptomatology, though continued complaints of pain about the knee. Upon initial evaluation, she had irritability along the medial aspect of the knee over the pes anserine group and through mid course of treatment had more irritability in the patellofemoral nature. In the latter third of her treatment she developed posterior knee pain and consulted her family phy-

sician and is now being referred to an orthopedist for further work up. Essentially, she reports no changes in her overall pain complaints in terms of their degree, however, they have certainly changed in location. She appears to be rather focused on her symptomatology and her reported levels of impairment.... Her· gait remains somewhat exaggerated in terms of its antalgia.[12]

> In summary, minimal to no change is noted in her given status and it appears that she is rather focused and becoming somewhat hypersensitive with her given examination. At this time, I am discharging her from active care.

(*Id.* at 56).

Thereafter, on May 14, 1996, Castle consulted another physician, Dr. Brian Ceccarelli, concerning the pain in her right knee. After examining her, Ceccarelli noted: "The right knee shows effusion with medial and lateral joint line pain, greater on the medial aspect. There is pain on patellar compression. There is some medial ligament laxity. The rest of her exam is normal." (*Id.* at 59). Ceccarelli believed that Castle's knee pain was caused by arthritis and a medial meniscal tear. (*Id.*).

On May 18, 1996, Dr. Dooley sent a letter to Reliance Standard regarding its earlier denial of Castle's claim for long-term disability benefits. In that letter, the doctor stated: "It is my understanding you received notification that my office had returned Joyce Castle to work as of 2–16–96. This is incorrect. Her return to work time is still unknown. We write this letter as a matter of clarification. I would also

---

**12.** The term "antalgia" refers to the assumption of a particular posture or gait to lessen or avoid pain. *Dorland's Illustrated Medical* Dictionary (28th Ed.1994) at 90 (defining "antalgic").

appreciate a phone call regarding Joyce Castle's case."[13]   (*Id.* at 82).

On May 26, 1996, Castle wrote her own letter to Reliance Standard, asking the company to review her claim again.   In relevant part, her letter states:

> Doctor Dooley has read your letter which you sent me [denying the long-term disability claim,] and he is sending you a letter on this matter.

> Could you please go over my claim again[?] . . .

> At the time I hurt my foot at work I also injured my right knee which has been giving me a great deal of pain.

> Dr. Dooley knows of the knee pain I have been having and I have had therapy for it, but it has not helped as it gives me difficulty in walking and my foot also still swells up on me.

> In July, Dr. Brian Ceccarelli . . . will be doing the surgery on my knee to try and correct my problem.   You can give him a call also if you want and Dr. Dooley also needs for you to give him a call.

(*Id.* at 35).

Dr. Dooley next saw Castle on May 30, 1996.   After that visit, he noted:

> Still having problems with her left limb and intermittent swelling and pain in and about the left ankle and foot, plantar aspect left heel.   Limping so badly on her right knee, she is pending knee surgery for torn meniscus and arthritis.   Referral letter from Dr. Ceccarelli.   He is the surgeon.   At this point I do not feel there is anything further that

we can do for Joyce. . . . Dr. Ceccarelli has agreed in his report that all conservative measures appear to have been performed to correct this problem in a conservative manner.   I told her in my opinion perhaps the differentiation in gait due to her right knee pain has caused this recalcitrant problem on the left to become more so.   I stated that as my opinion.   May get better results if the right knee is fixed . . . I will see her after rehab on a three month recall.

(*Id.* at 26).

After undergoing knee surgery,[14] Castle visited Dr. Dooley again on July 16, 1996, and he noted that it was "too early to tell" whether the surgery would "help some of the pain she states she has and swelling in her left foot and ankle."   (*Id.* at 26).   Castle's last recorded visit to Dr. Dooley occurred on October 7, 1996.   After that visit, the doctor noted: "She is having a rather tough straights [sic] with her right knee problem.   She has some plantar fascitis left.   I do not feel that this is a major orthopedic concern.   Her knee is, they are contemplating total knee at this point. . . ."   (*Id.*).

Several months later, on December 27, 1996, Reliance Standard rejected Castle's appeal from its earlier denial of her claim for long-term disability benefits.   (*Id.* at 11).   As set forth above, the company once again relied solely upon Cindy Winkeljohn's discharge summary of February 15, 1996, stating, in relevant part:

> . . . The records of February 15, 1996[,] stated that Ms. Castle had little or no edema, that she was ambulating without

---

**13.**   The record does not reflect that Reliance Standard ever contacted Dr. Dooley.

**14.**   The record does not reflect the nature of the knee surgery performed by Dr. Ceccarelli, but Dr. Dooley's May 30, 1996, note suggests that the surgery involved the repair of a torn meniscus.   (Doc. # 16, Exh. B at 26).

the aid of a cane, and she walked without a limp. In addition she was able to ambulate the stairs without a problem., [sic] and was released from Physical Therapy because of her continued progress.

... Even though Dr. Dooley has stated that Ms. Castle was not released to return to work on or about the 15th of February, 1996, there is no objective evidence and no x-ray reports or testing records presented beyond that date which show that Ms. Castle is still considered disabled and unable to perform the material duties of her regular occupation.

Given these facts, we find we must uphold the denial of long term disability benefits because we do not have objective medical evidence to show proof of continuing disability beyond the elimination period.

(*Id.*).

## B. *Arbitrary and Capricious Denial of Long Term Disability Benefits*

After reviewing the foregoing evidence, the Court concludes that Reliance Standard's final, December 27, 1996, decision denying Castle's claim for long-term disability benefits was arbitrary and capricious. As set forth above, Reliance Standard based its denial of her claim on two facts: (1) her ability to walk and to navigate stairs without difficulty or pain on February 15, 1996, during a therapy session with Winkeljohn; and (2) the absence of any "objective medical evidence," after that date, establishing that she was still unable to perform the material duties of her regular occupation. Absent such evidence, Reliance Standard informed Castle that she had failed to satisfy the 180–day "elimination period" contained in her policy.[15]

**15.** As set forth, *supra,* the Reliance Standard policy at issue requires a claimant to be "totally disabled" for 180 consecutive days before becoming eligible for long-term disability benefits. Under the policy, a claimant is considered "totally disabled" if, during the elimination period, she cannot perform each and every material duty of her regular occupation. In the present case, Castle does not dispute that she last worked on September 27, 1995, or that her 180–day elimination period began to run on that date. After reviewing Castle's brief, however, it is unclear to the Court why the elimination period did not start running much earlier. In her Memorandum, Castle contends that she received short-term disability benefits from April 27, 1995, to November 5, 1995, for the same injury that is at issue in the present litigation. (Doc. # 18 at 4, 9). This assertion is consistent with evidence establishing that Dr. Dooley first removed Castle "from her long-term walking and standing job activities" on April 24, 1995. (Doc. # 16, Exh. B at 17). The record also reflects that Dr. Dooley released Castle to return to work on August 31, 1995. (*Id.* at 19). Consequently, it appears that she did return to work for Advertising Display Company in September, 1995, as Reliance Standard contends. Even if Castle did return to work from on or about August 31, 1995, through September 27, 1995, however, it remains unclear why her elimination period did not begin to run until the latter date. Notably, Castle's Reliance Standard policy contains a provision concerning "interruption" periods. In relevant part, it states:

Interruption Period: If, during the Elimination Period, an Insured returns to Active Work for less than 30 days, then the same or related Total Disability will be treated as continuous. Days that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period. This interruption of the Elimination Period will not apply to an Insured who becomes eligible under any other group long term disability insurance plan. (*Id.* at 9).

If Castle received short-term disability benefits because she was unable to work from April 27, 1995, to November 5, 1995 (with the exception of the brief period in September, 1995), it appears that her elimination period may have started running long before September 27, 1995. If so, her brief return to work in September, 1995, would not have triggered a new elimination period because she returned for less than 30 days. Under the policy provision concerning "interruption" periods, she would not have been entitled to credit toward her 180–day elimination period

Upon review, the Court concludes that Reliance Standard's reasoning resulted in the arbitrary and capricious denial of Castle's claim for long-term disability benefits. With respect to the first issue, the fact that Castle performed well during a therapy session on February 15, 1996, by walking without pain does not demonstrate her ability to return to work as of that date, particularly when her performance is viewed in the context of the entire administrative record. It does not reasonably follow that she was capable of standing 10 hours per day, as her written job description required, merely because she was able to ambulate without pain during a brief therapy session.[16] Aside from the fact that Reliance Standard's conclusion on this issue is unreasonable on its face, that insurance company also received written notice from both Winkeljohn and Dr. Dooley,

expressly stating that Castle *was not* able to return to work as of February 15, 1996. In short, Reliance Standard's decision to deny long-term disability benefits, based upon Castle's performance during a single, somewhat brief therapy session, was arbitrary and capricious, particularly when viewed in the context of the entire administrative record, which reveals that she had on-going physical problems, both before and after that date.[17] Reliance Standard simply has not offered a "reasoned explanation, based on the evidence," for its conclusion that Castle was capable of returning to work as of February 15, 1996. *See, Perry,* 64 F.3d at 242.

The second fact relied upon by Reliance Standard, the absence of any "objective medical evidence" of disability after February 15, 1996, is equally unpersuasive.[18]

---

for the days in September, 1995, that she worked, but the 180–day period would not have started over. In any event, neither party has addressed the foregoing issue. Rather, both parties have proceeded on the premise that Castle's 180–day elimination period began to run on September 27, 1995. Given that Reliance Standard may well be able to explain why the elimination period commenced on September 27, 1995, the Court will not attempt to resolve the foregoing issue *sua sponte.* Instead, the Court will accept the parties' representation that the elimination period began to run on that date.

**16.** Cf. *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 441 (3rd Cir.1997) ("[Chronic fatigue syndrome] does not disable an individual afflicted with it from performing particular, isolated activities, but rather prevents him from performing all activities for any prolonged period of time. Thus, it is not inconsistent, given the characteristics of CFS, for Mitchell's doctor to conclude that Mitchell was totally unable to engage in substantial gainful activity, even though his ability to perform isolated activities such as standing, pushing, pulling, and communicating was only 'somewhat' limited.").

**17.** As set forth more fully, *infra,* the record does contain medical objective evidence sup-

porting the belief of Dr. Dooley and Cindy Winkeljohn that Castle was not capable of returning to work on February 15, 1996.

**18.** Given that Castle's ability to walk without pain during the therapy session on February 15, 1996, was not itself particularly noteworthy (i.e., it did not reasonably suggest that she was capable of standing without pain for 10 hours, as required by her job), the Court is uncertain why Reliance Standard considers the absence of "objective medical evidence" after that date to be fatal to her claim for long-term disability benefits. In other words, as the Court will explain more fully, *infra,* the record contains substantial *pre*-February 15, 1996, objective medical evidence to support Dr. Dooley's conclusion that Castle was incapable of performing each and every material duty of her job, as she could not stand for long periods of time. The fact that Castle ambulated without pain during one therapy session on February 15, 1996, does little, if anything, to undermine his conclusion. Consequently, the Court cannot discern why Reliance Standard found a need for Castle to supply *post*-February 15, 1996, objective evidence to substantiate Dr. Dooley's medical opinion. In any event, as the Court will explain more fully, *infra,* the administrative record does contain at least some objective medi-

As an initial matter, the Court notes that the record contains a substantial amount of "objective medical evidence" pre-dating February 15, 1996, to support Dr. Dooley's conclusion that Castle was unable to work. Dr. Dooley, a podiatrist, first diagnosed Castle's complaints of pain as being caused by heel spurs and plantar fascitis. The doctor based this diagnosis in part upon x-rays, which depicted "maximum pronation with osteophytic lipping." (Doc. # 16, Exh. B at 17). Castle also underwent a bone scan, which "li[t] up in several areas." (*Id.* at 19). A second physician, Dr. McKinney, reviewed the results of Castle's diagnostic tests and, based upon that review, suspected that she was suffering from a stress fracture. (*Id.* at 23). In reaching this conclusion, he relied upon objective evidence, including the results of the bone scan and the x-rays. (*Id.*). The doctor noted that Castle had bone spurs, a "somewhat lowered arch" and "a swollen abductor hallucis muscle belly." (*Id.*). Finally, Dr. McKinney noted that "[s]he was dramatically positive on the medial and lateral compression test." (*Id.*). As a result of these objective observations, Dr. McKinney diagnosed Castle's pain as resulting from a covert stress fracture. (*Id.*).

Based upon the foregoing evidence, Dr. Dooley opined on March 13, 1996, that Castle "is going to have a difficult time in returning to the job force in performing long-term walking and standing activities...." (*Id.* at 37). Similarly, on April 1, 1996, Cindy Winkeljohn completed a "Physical Capacities Form" at the request of Reliance Standard. Therein, she stated that, as of February 15, 1996, Castle was capable of standing for only one to three hours per day, and working eight hours per day "while sitting." (*Id.* at 90). She also expressed her belief that Castle could lift a maximum of ten pounds, which was much less than her job required. (*Id.*). These conclusions by two medical professionals, Dr. Dooley and Winkeljohn, are well supported by the pre-February 15, 1996, objective medical evidence set forth above.[19]

In addition, the Court notes that therapist Charles Miller subsequently evaluated Castle after February 15, 1996, in connection with her complaints of knee pain. (*Id.* at 52–53). In the course of his examination, Miller noted continued ankle swelling, and he attributed Castle's complaints of knee pain to "pes anserine tendonitis and bursitis about the right knee which could be secondary to her abnormal gait patterning which was present with her left ankle complaints." (*Id.* at 52). Another physician, Dr. Brian Ceccarelli, subsequently saw Castle concerning the pain in her right knee. After examining her, Ceccarelli noted that her "right knee shows effu-

---

cal evidence of Castle's continuing disability after February 15, 1996.

**19.** In its reply Memorandum, Reliance Standard argues that "Castle failed to point out Dr. Dooley's significant concern that her symptoms had become exaggerated." (Doc. # 20 at 1). The insurance company bases this claim on Dr. Dooley's fear that casting her foot and ankle might lead to a "causalgia problem." As set forth above, however, "causalgia" appears to be a recognized medical condition. The term has been defined as a "[p]ersistent severe burning sensation of the skin, usually following direct or indirect (vascular) injury of sensory fibers of a peripheral nerve, and accompanied by cutaneous changes (temperature and sweating)." Stedman's Medical Dictionary (5th Unabridged Lawyers' Edition 1982) at 238; *see also Wyatt v. Finch*, 340 F.Supp. 818, 822 (W.D.Va.1972) ("Causalgia is defined as a burning sensation or pain, especially in the palms and soles, caused by injury to the nerves which carry impulses from these parts. In some cases, the skin undergoes deteriorative changes.").

sion [20] with medial and lateral joint line pain, greater on the medial aspect. There is pain on patellar compression. There is some medial ligament laxity." (*Id.* at 59). Ceccarelli opined that Castle's knee pain was caused by arthritis and a medial meniscal tear (*Id.*), and he performed knee surgery in July, 1996, in an effort to remedy her problems.[21] (*Id.* at 26, 35). Thereafter, on October 7, 1996, Dr. Dooley noted that Castle had "some plantar fascitis left" and, more importantly, he characterized her knee problem as "a major orthopedic concern," which could require a total knee replacement. (*Id.* at 26).

The foregoing objective medical evidence establishes recognized causes for Castle's complaints of pain, which she voiced both *before* and *after* February 15, 1996. When viewed in the context of the entire administrative record, the fact that she was complaint free during an isolated therapy session cannot reasonably be construed to mean that she was capable of returning to work at that time, particularly in view of the requirements of her job, to wit: standing 10 hours per day. *Cf. Govindarajan v. FMC Corp.*, 932 F.2d 634, 637 (7th Cir.1991) (concluding that a plan administrator's selective review of the evidence supported a finding that his decision was arbitrary and capricious).[22]

In short, the administrative record reveals that the present case is not one in which a claimant sought long-term disability benefits, based upon mere unconfirmed allegations of pain without any medical foundation. In such a case, an insurance company quite reasonably may insist upon objective medical evidence to confirm that the claimant is not a malingerer, and it reasonably might deny a claim for benefits when such evidence is lacking. *Cf. Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir.1996) ("In the absence of any definite anatomic explanation of plaintiff's symptoms, we cannot find that the administrator's decision to deny benefits was arbitrary and capricious.").

---

20. "Effusion" involves the "escape of a fluid into a tissue or part ... by rupture of a vessel or by exudation through the walls[.]" Webster's Third New International Dictionary (Unabridged 1976) at 726.

21. In its reply Memorandum, Reliance Standard contends that Castle did not consult Dr. Ceccarelli until after it had denied her claim. (Doc. # 20 at 5). Although this statement is correct, it requires clarification. Castle saw Ceccarelli after the *initial* denial of her claim but before the *final* denial. Consequently, references to her visits with Ceccarelli are included in the administrative record, and such information may be considered by the Court herein. *See, e.g., Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir.1991) ("[W]hen reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made. This limitation applies to both an 'arbitrary and capricious' or a de novo standard of review.").

22. In *Govindarajan*, the plan administrator terminated the claimant's disability benefits based upon an isolated medical report from the claimant's treating physician. *Govindarajan*, 932 F.2d at 637. That report, which was dated May 2, 1986, suggested that the claimant was capable of returning to work. *Id.* Subsequently, the plaintiff's treating physician explained that further evaluation was needed before a return-to-work date could be established. *Id.* In addition, the record in *Govindarajan* contained evidence from other medical professionals who agreed that the claimant could not work and cited physical causes to support their opinions. *Id.* The district court reasoned that the plan administrator's " 'selective review of the medical evidence and its completely erroneous assertion that there was no physical cause for the subjective symptoms of pain renders its decision not only unreasonable but arbitrary and capricious.' " *Id.* Upon review, the Seventh Circuit found the district court's determination to be "amply supported" by the record. *Id.*

In the present case, however, Castle's physicians did identify anatomic explanations for her pain. Castle visited several health care professionals regarding her complaints of pain. As a result of those complaints, she underwent diagnostic testing, which provided objective medical evidence that she suffered from the abnormalities set forth above. After reviewing Castle's complaints and her test results, the aforementioned health care professionals linked her symptoms to one or more recognized medical conditions. In addition, Dr. Dooley and Winkeljohn informed Reliance Standard in writing that Castle's medical problems and complaints of pain were serious enough to prevent her from performing each and every material duty of her job, which required her to stand for 10 hours per day.[23] Upon review, the Court is not clear what more Castle could have done to establish her entitlement to long-term disability benefits. In any event, the Court concludes, for the reasons set forth above, that nothing more was required of her, and that Reliance Standard acted arbitrarily and capriciously in concluding that she had failed to satisfy the elimination period and in denying her claim on that basis.

The Court notes, however, that Reliance Standard advances two additional arguments in support of its decision to deny Castle's claim for long-term disability benefits. *First,* the insurance company contends that Castle failed to provide it with "objective medical evidence" to show that she had a continuing disability which rendered her totally disabled following the expiration of her elimination period. Stated differently, Reliance Standard argues that even if Castle was totally disabled in late March, 1996, when her elimination period ended, she failed to present evidence to support a finding that she remained totally disabled thereafter, during the period in which long-term disability benefits should have been paid to her. *Second,* the insurance company argues that Castle failed to present it with evidence showing that she had continued under the regular treatment of a physician, as required by her policy. Upon review, the Court finds both of these arguments to be unpersuasive.

With respect to the first issue, the Court notes that Castle was entitled to begin receiving long-term disability benefits under her Reliance Standard policy, if she satisfied the 180-day elimination period and met all other requirements. As set forth above, Reliance Standard denied Castle's claim based solely on its finding that she was capable of returning to work as of February 15, 1996.[24] As a result, the issue presently before the Court is whether Reliance Standard acted arbitrarily and capriciously in finding that Castle was able to return to work on that date and in

---

**23.** In its reply Memorandum, Reliance Standard now suggests that Castle's job required the performance of primarily "sedentary" tasks. Consequently, it argues that she was capable of performing the "material aspects" of her employment. (Doc. # 20 at 5). This argument is lacks merit. Regardless of whether the "material aspects" of Castle's employment are "sedentary," the written job description provided by her employer expressly states that she is required perform those functions while standing 10 hours per day. Based upon their examinations of Castle, and the objective medical evidence before them, Dr. Dooley and Winkeljohn both determined that she was unable to satisfy this requirement. Absent her ability to do so, the Court cannot agree with Reliance Standard's argument that she was capable of performing each and every material duty of her regular occupation.

**24.** As a result of this finding, the insurance company reasoned that Castle failed to complete her elimination period, which the parties agree expired in late March, 1996.

denying her claim on that basis. In its analysis, *supra*, the Court has concluded that Reliance Standard did act arbitrarily and capriciously in finding that Castle failed to satisfy her elimination period because she was capable of returning to work on February 15, 1996. Reliance Standard now argues, however, that even if Castle satisfied the elimination period, she failed to present it with evidence to support a finding that she remained totally disabled at some unspecified point in time after the elimination period had expired.[25] For present purpose, this argument is immaterial. The issue before the Court is not the *duration* of Castle's entitlement to long-term disability benefits following the completion of her elimination period. Rather, the issue is whether Reliance Standard acted arbitrarily and capriciously in concluding that she was not entitled to receive *any* such benefits, because she could have returned to work in February, 1996. Based upon the reasoning and citation of authority set forth above, the Court concludes that Reliance Standard's decision with respect to this issue was arbitrary and capricious. Consequently, Castle was entitled *to begin* receiving long-term disability benefits under the terms of her insurance policy.[26] This is not to say, however, the Castle is entitled to continue receiving such benefits permanently. If she fails to satisfy her policy definition of "total disability" or "totally disabled" at some point after the expiration of her elimination period, then her receipt of long-term disability benefits may well cease. That issue is not before the Court at this time, given Reliance Standard's arbitrary determination that Castle was capable of returning to work in February, 1996, prior to the expiration of her elimination period.

Finally, the Court is unpersuaded by the insurance company's argument that Castle is not entitled to benefits because she failed to establish that she was under the continuing care of a physician. This argument fails for two reasons. *First*, without respect to the merits of this argument, it fails because her plan administrator did not rely upon it to deny her claim for benefits. "ERISA sets certain minimum requirements for procedures and notifica-

25. As noted, *supra*, Castle's Reliance Standard policy defines the phrase "totally disabled" somewhat differently once the elimination period has been satisfied and a claimant is receiving long-term disability benefits.

26. Parenthetically, the Court finds no merit in Reliance Standard's assertion that the record is devoid of "objective medical evidence" showing that Castle remained totally disabled for at least some time after the March, 1996, expiration of her elimination period. As set forth more fully, *supra*, Dr. Dooley and Winkeljohn informed the insurance company in March and April, 1996, that she was unable of returning to work at that time. As the Court has explained herein, those opinions were supported by objective medical evidence. Dr. Ceccarelli also saw Castle after her completion of the elimination period. He noted that her "right knee shows effusion with medial and lateral joint line pain, greater on the medial aspect. There is pain on patellar compression. There is some medial ligament laxi-

ty." (Doc. # 16, Exh. B at 59). Dr. Ceccarelli believed that Castle's knee pain was caused by arthritis and a medial meniscal tear, and, as noted above, he ultimately performed knee surgery on her.

In light of the foregoing evidence, the Court cannot agree that Castle failed to present Reliance Standard with any "objective evidence" of a continuing disability beyond the elimination period. In any event, for present purposes, the issue before the Court is whether Reliance Standard acted arbitrarily and capriciously when it determined that she was capable of returning to work on February 15, 1996. The fact that she may have been unable to satisfy the policy definition of "total disability" or "totally disabled" at some point after the expiration of her elimination period, and therefore may have lost her right to continue receiving benefits, is not relevant to the Court's analysis herein.

tion when a plan administrator denies a claim for benefits. In a nutshell, ERISA requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair' review by the administrator." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir.1992); *see also* 29 U.S.C. § 1133 (requiring written notice of the "specific reasons" for the denial of a claim); 29 C.F.R. § 2560.503–1(f) (requiring a plan administrator or insurance company to provide a claimant with "[t]he specific reason or reasons for the denial" of her claim).[27] "These requirements insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." *Halpin*, 962 F.2d at 689.

In the present case, Castle's Reliance Standard policy establishes four requirements for a claimant to receive long-term disability benefits. Specifically, a claimant must: (1) be "totally disabled" as a result of a covered sickness or injury; (2) be under the regular care of a physician; (3) have completed the "elimination period"; and (4) submit satisfactory proof of "total disability" to Reliance Standard. (Doc. # 16, Exh. A at 8.0). On April 12, 1996, a Reliance Standard claims examiner denied Castle's claim for long-term disability benefits solely on the basis of her failure to satisfy her 180–day elimination period. (*Id.*, Exh. B at 80). Thereafter, the insurance company rejected an appeal from the denial of her claim, once again relying solely on her failure to satisfy the elimination period. (*Id.* at 11–12).

By failing to cite the "regular care of a physician" requirement as a basis for denying Castle's claim, Reliance Standard appears to have violated the ERISA statute and regulations set forth above. In so doing, the insurance company deprived Castle of the opportunity to present evidence on this issue when she appealed the denial of her claim to Reliance Standard's Quality Review Unit. In this Court's view, the insurance company's counsel should not be permitted now to rely upon a *post hoc* justification for the plan administrator's decision to deny Castle's claim. *Cf. Ellis v. Egghead Software Disability Plans*, 64 F.Supp.2d 986, 992–993 (E.D.Wash.1999) (concluding that an insurance company waived its argument that a claimant was not under the "regular care of a licensed physician" by failing to mention it during the administrative review process); *see also Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1016 (9th Cir.1997) (Fletcher, J., concurring in part and dissenting in part) ("To allow a plan to raise new reasons for denial on judicial review could subject the plan participant to a cycle of multiple appeals.").

*Second*, Reliance Standard's argument lacks merit, even if it is properly before this Court. As noted above, the present

---

**27.** This regulation provides that notice of a claim denial must contain the following information:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f).

The purpose of the foregoing requirements is "to afford the beneficiary and the courts a sufficiently precise understanding of the ground for the denial to permit a realistic possibility of review, even under a deferential standard." *Halpin*, 962 F.2d at 694.

dispute between the parties does not concern the duration of Castle's entitlement to long-term disability benefits after the completion of her elimination period. Rather, the pertinent issue is whether Castle was entitled to begin receiving those benefits. In its analysis, *supra*, the Court concluded that Reliance Standard acted arbitrarily and capriciously in finding that Castle did not satisfy elimination period, which expired on or about March 27, 1996. As a result, the Court reasoned that she was entitled to receive long-term disability benefits for at least some period of time.

Similarly, with respect to the issue of Castle being under the "regular care of a physician," the proper inquiry, for present purposes, is whether she was under such care at least through her elimination period. If so, she was entitled to begin receiving long-term disability benefits, even if she subsequently stopped receiving regular care from a physician and thereby jeopardized her right to obtain benefits in the future. Based upon the evidence contained in the administrative record, it is evident that Castle *did* remain under the regular care of a physician, at least through her elimination period, which ended in late March, 1996. The record reflects that Castle visited Dr. Dooley on December 7, 1995. (Doc. # 16, Exh. B at 22). She then visited Dr. McKinney on December 14, 1995. (*Id.*). She consulted Dr. Dooley again on January 17, 1996. (*Id.* at 24). She then returned to Dr. Dooley on January 22, 1996, and he directed her to undergo physical therapy. (*Id.*). Consequently, she consulted physical ther-

apist Winkeljohn on January 25, 1996.[28] (*Id.* at 31). Castle then returned to Dr. Dooley on February 8, 1996. (*Id.* at 24). The doctor directed her to continue treatment with Winkeljohn, who saw her again on February 15, 1996. (*Id.* at 33). Thereafter, Castle returned to Dr. Dooley on March 5, 1996, and he scheduled a follow-up visit. (*Id.* at 24). On March 13, 1996, Dr. Dooley drafted correspondence expressing his concern about her ability to work. (*Id.* at 37–38). Subsequently, on April 16, 1996, *well after* the completion of Castle's elimination period, physical therapist Miller evaluated her for Dr. Dooley.[29] (*Id.* at 52–53). She then consulted Dr. Ceccarelli on May 14, 1996. (*Id.* at 59). On May 18, 1996, Dr. Dooley wrote to Reliance Standard and explained that Castle had not been released to return to work. (*Id.* at 82). Castle then visited Dr. Dooley again on May 30, 1996. (*Id.* at 26). Dr. Ceccarelli subsequently performed knee surgery on Castle, and she returned to see Dr. Dooley on July 16, 1996. (*Id.* at 26). Her final recorded visit to Dr. Dooley occurred on October 7, 1996. (*Id.*). In light of the foregoing evidence contained in the administrative record, it is evident that Castle did continue under the regular care of a physician throughout her elimination period, which expired in late March, 1996. Consequently, the Court rejects Reliance Standard's contention that she cannot satisfy this condition precedent to her receipt of long-term disability benefits.[30] The insurance company's argument on this point is contrary to the undisputed evidence in the record.

---

**28.** Although Winkeljohn is not a physician, Castle visited her at the direction of Dr. Dooley, who is a physician.

**29.** Once again, although Miller is not a physician, Castle appears to have visited him at the direction of Dr. Dooley.

**30.** This is not to say, however, the Castle is entitled to continue receiving such benefits permanently. If she fails to remain under the regular care of a physician after the completion of her elimination period, then her right to receive long-term disability benefits may well terminate. That issue is not presently before the Court.

III. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Court concludes that the Defendant acted arbitrarily and capriciously when it denied the Plaintiff's claim for long-term disability benefits solely the basis that she was capable of returning to work in February, 1996, and therefore could not satisfy the 180–day elimination period contained in her insurance policy. The Defendant is hereby directed to award the Plaintiff retroactive long-term disability benefits, beginning on the date that her 180–day elimination period expired, and continuing thereafter until she is no longer entitled to receive those benefits under the terms of her Reliance Standard policy, as interpreted by the plan administrator.

Judgment will be entered in favor of the Plaintiff and against the Defendant, directing the Defendant to award the Plaintiff retroactive long-term disability benefits, beginning on the date that her 180–day elimination period expired, and continuing unless and until such time as the Defendant finds the Plaintiff to be no longer totally disabled.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.