**Carolyn EBERT, Plaintiff,**

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY, et al., Defendants.**

**No. C200–0014.**

United States District Court, S.D. Ohio, Eastern Division.

Oct. 30, 2001.

Thomas Hampton, Yoss & Hampton, Barnesville, OH, for plaintiff.

James Michael Wiles, Wiles, Boyle Borkholder & Bringardner, Columbus, OH, for defendants.

## OPINION AND ORDER

SARGUS, District Judge.

This matter comes before the Court upon Plaintiff Carolyn Ebert's ("Plaintiff") appeal from Reliance Standard Life Insurance Company's ("Defendant") denial of her claim for long-term disability benefits under an employee benefit plan ("Plan") governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § § 1001, *et seq.* (Doc. # 12), and upon Defendant's Motion for Summary Judgment. (Doc.# 13). The Court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331. For the reasons that follow, Defendant's Motion for Summary Judgement is **DENIED** and Defendant's decision to deny long-term disability benefits to Plaintiff is **REVERSED**. As a result, Plaintiff is entitled to receive retroactive long-term disability benefits under the terms of the Plan for a thirty-six (36) month period, beginning on June 4, 1997, the date her six month elimination period expired.[1] Defendant is **DIRECTED** to review Plaintiff's claim, consistent with this Opinion, to determine whether she is entitled to continuing monthly disability benefits beyond the initial thirty-six (36) months.

### I.

Plaintiff worked at the Barnesville Hospital ("Hospital") for over 21 years as a cardiopulmonary assistant. (Doc. # 6, p. 130). A written job description provided by the Hospital identifies Plaintiff's job responsibilities as including, *inter alia,* that she take care of medical equipment, that is, deliver, set up and remove, disassemble and clean equipment. She also provided respiratory therapy to patients and maintained stock levels of supplies. (Doc. # 6, p. 139–40).

In connection with Plaintiff's disability insurance claim, the Hospital submitted a "Job Analysis" form provided by Defendant. (Doc. # 6, p. 132). The Hospital informed Defendant that Plaintiff's job required continuous standing, with "continuous" defined as doing the activity "67% to 100%" of the time; frequent walking, with "frequent" defined as doing the activity 34% to 66% of the time; and occasional sitting, balancing, stooping, kneeling, crouching, reaching or working overhead, and climbing stairs, with "occasional" defined as doing the activity 1% to 33% of the time. R. 132. The Hospital also explained that Plaintiff's job required occasional pushing, pulling, lifting and carrying, but failed to indicate the weights of objects involved in these activities. *Id.* Finally, the hospital stated that Plaintiff's job could not be performed by alternating sitting and standing. *Id.*

While employed by the Hospital, Plaintiff was covered by a long-term disability insurance policy issued to her employer by Defendant. (Doc. # 6, p. 1–19). The disability policy is an employee welfare benefit plan governed by ERISA. (Doc. # 13, p. 1). Among other benefits, the policy provides for long-term disability benefits to be paid when an insured:

(1) is Totally Disabled as the result of a Sickness or Injury covered by [the Plan];

(2) is under the regular care of a Physician;

(3) has completed the Elimination Period; and

(4) submits satisfactory proof of Total Disability to [Defendant].

(Doc. # 6, p. 14).

The policy defines "Totally Disabled" and "Total Disability" to mean, that as a result of an Injury or Sickness:

---

1. "Elimination Period" is defined as one hundred eighty (180) days of total disability, for which no benefit is payable. This period be-

gins on the first day of total disability. (Doc. # 6, p. 4–5).

(1) during the Elimination Period and for the first thirty-six (36) months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation. We consider the Insured "Totally Disabled" if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis; and

(2) after a Monthly Benefit has been paid for thirty-six (36) months, an insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow.

(Doc. # 6, p. 7).

In February 1994, Plaintiff severely injured her back at work. (Doc. # 13, p. 2; Doc. # 12, p. 4). Plaintiff's injury required back surgery. (Doc. # 6, p. 91, 93). While Plaintiff returned to work in January 1996, Plaintiff again stopped working in December of 1996 due to her previous back injury.

On June 4, 1997, after waiting the one hundred eighty (180) day elimination period required under the Plan, Plaintiff submitted an application for total disability as of December 3, 1997. (Doc. # 6, p. 134–35). On September 26, 1997, after reviewing Plaintiff's file and obtaining more medical information, Defendant denied Plaintiff's claim having determined that she did not meet the Plain's definition of "total disability." (Doc. # 6, p. 73–75).

Thereafter, through internal processes, Plaintiff appealed Defendant's denial of her long-term disability claim three times. (Doc. # 6, pp. 71–72, 41–43, 34). In response to each appeal, Defendant affirmed its previous denial. (Doc. # 6, pp. 57, 35,-25).

On December 3, 1999 Plaintiff filed this action in the Court of Common Pleas, Belmont County, Ohio. (Doc. # 1 attachment).

Defendant filed a Petition for Removal, pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 1132(e) and 28 U.S.C. § 1441(a), (b), (c). (Doc. # 1). Plaintiff filed a Brief in Support of Claim for Benefits on December 5, 2000, asking the Court to review Defendant's denial of her claim for long-term disability benefits pursuant to ERISA § 1132(a)(1)(B) and to grant her long-term disability benefits, or in the alternative, to remand her claim to Defendant for further evidence gathering and review. (Doc. # 12). Defendant filed a Response to Plaintiff's Claim for Benefits and a Cross–Motion for Summary Judgment on December 28, 2000. (Doc. # 13).

## II.

### A. *Summary Judgment*

Summary Judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 is an inappropriate mechanism for resolving a challenge to a denial of ERISA plan benefits since the trial court's "review of the challenged benefit decision is confined to the evidence contained in the administrative record." *University Hospitals of Cleveland v. Emerson Elec.*, 202 F.3d 839, 845 (6th Cir.2000) (referencing its decision in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir.1998)). When reviewing a plan administrator's denial of benefits, the Court ordinarily may consider only evidence that the administrator considered when reaching a final decision on the claim. *See Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir.1994) *cert. denied*, 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994). Thus, the Court will review the parties arguments, in light of the administrative record, and render its decision on the merits of Plaintiff's claim for Plan benefits. *See e.g., Castle v. Reliance Standard Life Insurance Company*, 162 F.Supp.2d 842, 846 (S.D.Ohio 2001).

Accordingly, the Court denies Defendant's Motion for Summary Judgment.

### B. Denial of Long–Term Disability Benefits

 Plaintiff brings its appeal of Defendant's denial of long-term disability benefits under ERISA § 1132(a)(1)(B). Initially, the Court must determine the proper standard of review to apply to Defendant's denial of Plaintiff's claim. The Supreme Court has held that "a denial of benefits challenged under section 1132(a)(1)(B) [of ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); see also Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir.1996). If the plan vests such discretion in the administrator or fiduciary, the decision is reviewed under the deferential arbitrary and capricious standard. See Perry v. United Food & Comm'l Workers District, 64 F.3d 238, 242 (6th Cir.1995); Perez v. Aetna Life Insurance Company, 150 F.3d 550, 555 (6th Cir.1998). This standard "is the least demanding form of judicial review .... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Perry, 64 F.3d at 242. Determinations are not arbitrary and capricious if they are "rational in light of the plan's provisions." Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 984 (6th Cir.1991) (quoting Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir.), cert. denied, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988)).

The Sixth Circuit has found that the phrase "satisfactory proof of total disability" in a similar policy constituted a clear grant of discretionary authority and held that the arbitrary and capricious standard of review applied. Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir.1996); see also Perez, 150 F.3d at 555–58 (6th Cir.1998); Castle v. Reliance Standard Insurance Co., at 847 (S.D.Ohio 2001).

 The policy at issue in the case sub judice contains the same language discussed in Yeager. Specifically, the policy at issue requires a claimant to submit "satisfactory proof of total disability to us" to receive monthly benefits. (Doc. # 6, p. 14). Accordingly, the Court finds that the language in the policy at issue provides Defendant with the discretion to determine Plaintiff's eligibility for benefits and reviews this case under the arbitrary and capricious standard. With the foregoing standard in mind, the Court turns now to the merits of this action.

### III.

 The issue before the Court is whether Defendant acted arbitrarily and capriciously when it denied Plaintiff's claim for long-term disability insurance benefits. The parties have provided the Court with a complete copy of the administrative record available to Defendant on August 4, 1998, when it made the final decision to deny Plaintiff's claim for plan benefits. (Doc. # 6, p. 25). To determine whether Defendant's denial of Plaintiff's claim was arbitrary and capricious, the Court first will review, in some detail, the evidence in the administrative record.

### A. Administrative Record

In February 1994, while working at the Hospital, Plaintiff severely injured her back. (Doc. # 6, p. 93). Plaintiff was diagnosed with a centrally herniated disk and stenosis at the L4–5 level of her spinal cord. Id. In September 1994, Dr. Fred Payne performed a lumbar laminectomy at

the L4–5 level and also a lumbar discectomy. (Doc. # 6, p. 91, 93). Plaintiff returned to work in January 1996, although, "in the November–December time frame she started having increasingly severe back and bilateral leg pain, worse on the left side with pain radiating down into the area of her foot, difficulty doing her job, lifting, bending and twisting and was having increasing problems and had to quit work on" December 3, 1996. (Doc. # 6, p. 91).

On January 28, 1997, Plaintiff was seen by Dr. Christopher Marquart, M.D., a neurosurgeon who had seen her in September 1995 after her back surgery. Dr. Marquart ordered an MRI to evaluate whether surgical intervention could alleviate Plaintiff's back pain. (Doc. # 6, p. 91–92).

On February 21, 1997, Dr. Marquart saw Plaintiff to evaluate her MRI which showed no evidence of a recurrent problem with the herniated disk in Plaintiff's back. (Doc. # 6, p. 87). Dr. Marquart renewed Plaintiff's pain medicine, Vicodin and Restoril, and requested physical therapy. *Id.* Dr. Marquart did not feel that Plaintiff would "be able to return to work as the type of work that she does has continually re-aggravated her back after her original surgery." (Doc. # 6, p. 88). The doctor further stated that Plaintiff had "restrictions of no bending, twisting, lifting, no direct patient lifting, pushing wheelchairs, etc. She could do mostly sedentary file clerk type work with no heavy lifting and frequent changes of position." *Id.*

On May 19, 1997, Plaintiff again saw her neurosurgeon, Dr. Marquart. (Doc. # 6, p. 84). Dr. Marquart determined that Plaintiff had not made any significant improvement from her physical therapy. The doctor concluded that Plaintiff had reached her maximum medical improvement and yet was left with some chronic difficulties with her leg. (Doc. # 6, p. 84). Dr. Marquart suggested that Plaintiff

should undergo some form of retraining for other types of employment. (Doc. # 6, p. 85).

On June 4, 1997, after waiting the required one hundred eighty (180) day elimination period required under the Plan, Plaintiff submitted an application for total disability. (Doc. # 6, p. 134–35).

On July 23, 1997, Dr. Baker completed an "Orth Neuro Physician's Report," as requested by Defendant. (Doc. # 6, p. 94–96). The report listed Plaintiff's diagnosis as: lumbar intervertebral disc, lumbar sprain/strain and lumbosacral sprain/strain. Physical findings were determined to be: loss of distortion of normal spinal curves and distinct muscle spasms. Diagnostic imaging results were listed as: standard x-rays show abnormalities consistent with the diagnosis. Findings from electrodiagnostic studies included: abnormal EMG and abnormal nerve conduction results, which were both listed as objective tests which correlated with clinical findings. Plaintiff's physical ability included the ability to frequently: balance and reach at or below shoulder level. Plaintiff's physical ability included the ability to occasionally: bend, stoop, twist, squat, kneel, crouch, crawl, climb stairs and ladders, lift, carry or push and pull a maximum of one to ten (1–10) pounds. Assessment and treatment were considered complicated by: Significant emotional or behavioral disorder such as depression, anxiety, hysteria. Finally, the doctor's report concluded that in a work day given two breaks and a meal break, Plaintiff could, with positional changes: sit for six (6) hours, stand for three (3) hours, walk for two (2) hours and alternately sit and stand for three (3) hours.

On July 23, 1997, Dr. Marquart completed an "Orth Neuro Physician's Report," as requested by Defendant. (Doc. # 6, p.

114). The report listed Plaintiff's diagnosis as: SIP lumbar disectomy by Dr. Fred Payne. Physical findings were determined to be: scars of prior surgery for back disease. Diagnostic imaging results were listed as: standard x-rays show abnormalities consistent with the diagnosis-scarring and MRI or CT scans confirm disease-scarring. Plaintiff's physical ability included the ability to frequently: lift, carry, push or pull one to ten (1–10) pounds. Plaintiff's physical ability included the ability to occasionally: balance and lift, push or pull eleven to twenty (11–20) pounds. Plaintiff's physical ability prevented her from being able to: stoop, twist squat, kneel, crouch, crouch, crawl, climb stairs and ladders, reach at or below shoulder level. Assessment and treatment were considered complicated by: significant emotional or behavioral disorder such as depression, anxiety, hysteria, and by exaggeration, inconsistent findings, subjective complaints out of proportion to objective findings, bizarre or contradictory observations. Finally, the doctor's report concluded that in a work day, given two breaks and a meal break, Plaintiff could: sit for two (2) hours, stand for two (2) hours, walk for two (2) hours and alternately sit and stand for two (2) hours. However, with positional changes Plaintiff could perform each of the previous activities only one (1) hour each.

On September 15, 1997, Defendant conducted an in-house "Nursing Review." (Doc. # 6, p. 76–77). This review was done by Defendant's employee Marianne Lubrecht Powell, who is not a physician, but is a registered nurse. Ms. Lubrecht summarized that Plaintiff's neurological evaluation revealed no objective reason for her pain, that the MRI showed no change and that Plaintiff was now walking with a cane for fear of falling. Ms. Lubrecht stated that patients who have had back surgery oftentimes have temporary exacerbations of pain. She also found no physical evidence of a cause of the perceived leg weakness. Ms. Lubrecht recommended Plaintiff have a Functional Capacity Evaluation ("FCE"). An FCE measures the residual occupational abilities of a patient per National Institute for Occupational Safety and Health guidelines. (Doc. # 6, p. 42–44).

On September 26, 1997, Defendant denied Plaintiff's claim having determined that she did not meet the Plan's definition of "total disability." (Doc. # 6, p. 73–75). Defendant did not suggest that Plaintiff obtain an FCE as suggested by its employee, Ms. Lubrecht.

Plaintiff appealed the denial on October 12, 1997 and on October 31, 1997. (Doc. # 6, p. 71–72). On February 9, 1998, Defendant affirmed its denial, stating that "[b]ased on our review, we find the original determination to deny your claim was correct." (Doc. # 6, p. 57). However, Defendant did at this time, suggest Plaintiff contact her physician for an FCE. (Doc. # 6, p. 58). Upon receipt, Defendant agreed it would review the FCE and advise Plaintiff of its findings. *Id.*

Terry Mason, a physical therapist, performed the suggested FCE on April 2, 1998. (Doc. # 6, p. 41–43). The evaluation stated that Plaintiff's efforts were "sub-maximal due to reported pain," and that Plaintiff was functioning at a "SEDENTARY–LIGHT" level and that her "prospective employment needs were considered a MEDIUM." (Doc. # 6, p. 43). Mr. Mason further explained the statistical outcome of the FCE in an attached letter. Mr. Mason explained that Plaintiff failed to meet the strength levels [2] consistent

---

**2.** The job strength index is an assessment of risk of injury on the job, based on static strength, and should ideally be less that 0.5.

(Doc # 6, p. 44). Plaintiffs Job strength index indicated a 9.00, a 3.89 and a 6.00. *Id.*

with seventy-five percent (75%) of the adult population in all three (3) postures tested.

Defendant received the FCE on June 15, 1998, and upon review affirmed its previous denial of Plaintiff's long-term disability claim in a letter dated June 30, 1998. (Doc. # 6, p. 35). Defendant concluded that the FCE indicated Plaintiff was capable of performing work at the sedentary to light level. Defendant also described Plaintiff's last occupation as a cardiopulmonary assistant as a sedentary position of employment. *Id.*

On July 7, 1998, Plaintiff submitted a copy of her job description that had been supplied by the Hospital, pointing out a discrepancy between the physical requirements of Plaintiff's job and Defendant's description of Plaintiff's job as "sedentary" in its June 30, 1998 denial letter. (Doc. # 6, p. 34). On August 3, 1998, Defendant's examiner, Rowena Saunders, referred the job description to Defendant's in-house Senior Vocational Rehabilitation Coordinator, Thomas A. Hardy, asking him to review it and "determine if in the general population it is considered sedentary, light or heavy." (Doc. # 6, p. 30). In her request, Ms. Saunders stated that "Based on the info [sic] previously on file I determined it was sedentary." *Id.* On that same day Mr. Hardy reviewed the job description supplied by the employer. He concluded that, based upon the Dictionary of Occupational Titles ("DOT") the position of Cardiopulmonary Technologist was the most accurate and appropriate code for Plaintiff's job. The DOT describes such job as consisting of light duty. (Doc. # 6, p. 27–28).

On August 4, 1998, Defendant affirmed its previous denials of Plaintiff's long-term disability benefits claim, stating that Plaintiff's FCE "indicated that she was capable of performing sedentary to light duties and that the majority of her duties are seden-

tary and some may even be considered light duties." (Doc. # 6, p. 25).

### B. *Arbitrary and Capricious Denial of Long–Term Disability Benefits*

After reviewing the foregoing evidence, the Court concludes that Defendant's decision denying Plaintiff's claim for long-term disability benefits was arbitrary and capricious. As set forth *supra*, Defendant based its denial of Plaintiff's claim on the determination that she did not meet the Plan's definition of total disability because (1) Plaintiff's FCE indicated she was capable of performing sedentary to light duties and the majority of duties of her regular occupation are sedentary and light. (Doc. # 6, p. 25, 36), and because of; (2) no objective medical evidence demonstrated a change of condition as of December of 1996 which would cause Plaintiff to be considered totally disabled from performing the material duties of her regular occupation. (Doc. # 6, p. 57, 74).

### 1. *Functional Capacity Evaluation*

In considering whether Plaintiff's FCE indicates she was capable of performing the duties entailed in her regular occupation, it is first necessary to define the duties of Plaintiff's regular occupation. Defendant asserts that Plaintiff's "own or regular occupation is not [Plaintiff's] job with a specific employer, it is not [Plaintiff's] job within a particular work environment, nor is it [Plaintiff's] specialty in a particular occupational field." (Doc. # 6, p. 73). Rather, Defendant claims that when "evaluating [Plaintiff's] eligibility for benefits, we must evaluate [Plaintiff's] inability to perform [her] own or regular occupation as it is performed in a typical work setting for any employer in the general economy." *Id.* The Court finds it unnecessary to determine whether this novel definition of "own or regular occupa-

tion" is rational in light of the Plan's own provisions. Rather than evaluating how Plaintiff's own or regular occupation was performed in the general economy, Defendant used the DOT to obtain a description of what it decided to consider to be Plaintiff's own or regular occupation. Defendant justifies its use of the DOT by arguing that the "material duties identified by the hospital for a cardiopulmonary assistant are similar to the material duties contained in the [DOT] for a cardiopulmonary technologist." (Doc. # 13, p. 1). Defendant asserts that the DOT description of Cardiopulmonary Technologist is the most accurate and appropriate code for Plaintiffs's occupation. (Doc. # 6, p. 27). According to the DOT, the position of cardiopulmonary technologist is a light duty job. Defendant contends that the FCE indicates that she can perform light duties.[3] (Doc. # 6, p. 27). Consequently, Defendant's argument concludes that Plaintiff is capable of performing the material duties of her regular occupation.

Defendant's argument is unpersuasive for the following reasons. First, the Court finds that the DOT-specified occupation of Cardiopulmonary Technologist is not similar to Plaintiff's actual job as Cardiopulmonary Assistant. A comparison of the two evinces significant differences. The DOT provides that a Cardiopulmonary Technologist:

> Performs diagnostic tests of cardiovascular and pulmonary systems of patients to aid physician in diagnosis and treatment of heart, lung, and blood vessel disorders:

**TASKS:**

1. Prepares patient for test and explains procedures to obtain cooperation and reassure patient.

2. Conducts electrocardiogram, phonocardiogram, echocardiogram, stress testing, and other tests to aid in diagnosis of cardiovascular system, using variety of specialized electronic test equipment, recording devices, and laboratory instruments.

3. Conducts tests of pulmonary system to aid physician in diagnosis of pulmonary disorders, using spirometer and other respiratory testing equipment.

4. Operates multichannel physiologic monitor, as part of cardiac catheterization team, to measure and record functions of cardiovascular and pulmonary systems of patient during cardiac catheterization.

5. Alerts physician to instrument readings outside normal ranges during cardiac catherization procedures.

6. Provides test results to physicians.

| | | |
|---|---|---|
| Strength: | L | Light—Lift up to 20 pounds |
| Physical Demands: | Reaching | Frequently |
| | Handling | Frequently |
| | Fingering | Frequently |
| | Feeling | Occasionally |
| | Talking | Occasionally |
| | Hearing | Occasionally |
| | Near Acuity | Frequently |
| | Color Vision | Occasionally |

(Doc. # 6, 28–29). This DOT-specified job description is quite *dissimilar* to Plaintiff's job description, which provides:

**POSITION SUMMARY:**

Under the supervision of the Director of Cardiopulmonary and upon the request of the physician *sets up and operates various types of equipment* to be uti-

---

**3.** The Court notes that Defendant has made highly selective use of bits and pieces of the FCE, as would be expected of an advocate, but not a neutral evaluator of claims. Defendant relies on a sentence in the FCE which states that Plaintiff is capable of performing sedentary to light job duties, yet chooses to ignore the very next sentence of the FCE, which states that Plaintiff's "prospective job requirements are MEDIUM." (Doc. # 6, p. 43).

lized in the diagnosis and treatment of respiratory disease and/or illness.

## MAJOR DUTIES AND RESPONSIBILITIES:

Provides conventional and routine respiratory therapy to patients as ordered.... *Sets up equipment and medications* and administers treatments as ordered, e.g. oxygen administration, humidity therapy, airway management, resuscitation, mechanical ventilation, postural drainage procedures, closed atmosphere and respiratory monitoring, intermittent positive pressure breathing, and pharmacology respiratory therapy. Charts treatment response, and progress.

*Delivers and sets up equipment and monitors patients* on continuous ventilation. Does nasotracheal and tracheal (endotracheal tube or tracheostomy) suctioning.

Makes patient rounds regularly. Observes patients, checks equipment, changes or makes adjustments as necessary.... *Removes equipment from patient room and disassembles and cleans it....*

Assists with care and maintenance of department equipment and supplies. *Maintains stock levels of supplies....* [Emphasis added].

Standing most of the scheduled shift ... Intermittent exertion in positioning, lifting, transferring patients, equipment, and/or materials

(Doc. # 6, p. 139–40).

The above descriptions indicate that while a Cardiopulmonary Technologist, as defined by the DOT, requires sedentary to light duties, Plaintiff's job is considerably more strenuous. The most physically demanding work performed by the a Cardiopulmonary Technologist appears to be conducting tests and *using* specialized medical equipment. The job clearly does not include any delivery or set up of equipment, maintenance of stocks of supplies or the positioning and lifting and transferring of patients, equipment or materials-all of which is required by Plaintiff's job. Classifications of job duties such as sedentary, light, medium and heavy are of little consequence when they are based on a job that is not the job performed by Plaintiff or are based on a job that is not sufficiently similar to the job performed by Plaintiff.

Further, the Plan defines disability during the first three years of benefits as an inability to perform "the material duties of his/her regular occupation." (Doc. # 6, p. 7). The policy does not define the duties of an insured's regular occupation to mean the duties of a "similar" DOT-specified occupation.[4] Defendant is not is a position where it must determine Plaintiff's regular job duties in the absence of an actual job description. The Hospital provided a job description as well as a supplemental job description at the request of Defendant that further described the duties required of Plaintiff while at work at the Hospital. The Hospital is free to define the duties required for jobs performed by its employees. There is no reason to assume that a national standard set forth in the DOT defines the duties of Plaintiff's regular occupation.

---

**4.** It seems clear to the Court that the drafters of the Plan intended this construction. This is revealed by the Plan's distinction of what constitutes "totally disabled" during different periods of disability. During the Elimination Period and first thirty-six (36) months "total disability" is defined as unable to perform "his/ her regular occupation." (Doc. # 6, p. 7). During the following period, after the initial thirty-six months, "total disability" is defined as unable to perform "any occupation" i.e. "Any occupation is one that the Insured's education, training or experience will reasonably allow." *Id.*

## 2. Objective Medical Evidence

The second argument relied upon by Defendant in its denial of Plaintiff's claim for long-term disability benefits is equally unpersuasive. Defendant claims that there is an absence of any objective medical evidence to show a change of condition as of December of 1996 which would cause Plaintiff to be considered "totally disabled" from performing the material duties of her regular occupation. (Doc. # 6, p. 57, 74). As an initial matter, the Court notes that the record contains a substantial amount of objective medical evidence of Plaintiff's disability. The evidence on which Defendant relies as a basis to deny Plaintiff's claim amounts to a few sentences taken from the administrative record. These few sentences are taken entirely out of context, and when viewed in context do not represent that which Defendant claims. Further, Defendant ignores several key documents, such as the abnormal x-ray report and the Ortho Neuro Physician's Reports, discussed *supra.*

The Court concludes that it was arbitrary and capricious for Defendant to deny Plaintiff's claim based upon an incomplete review of the record, particularly when viewed in the context of the entire administrative record, which reveals that Plaintiff had on-going physical problems, **both before and after** December 1996 because of the initial work-related back injury and subsequent back surgery.[5] Selective review of evidence supports a finding

that Defendant's decision was arbitrary and capricious. *See e.g., Castle,* at 855–56 (concluding a plan administrator's selective review of the administrative record was arbitrary and capricious); *Govindarajan v. FMC Corp.,* 932 F.2d 634, 637 (7th Cir.1991) (same).

Defendant contends that Plaintiff's December 6, 1996 claim is based on subjective complaints or medical opinions that are not substantiated by objective medical findings based on its evaluation of the following medical records: (1) an MRI performed in February of 1997, which showed no evidence of recurrent disk, spinal stenosis or significant nerve root compression (Doc. # 6, p. 87–90); (2) Dr. Marquarts May 19, 1997 conclusion that Plaintiff's "condition did not change after physical therapy and that [she] had reached maximum medical improvement" (Doc. # 6, p. 84); (3) Dr. Marquart's June 4, 1997 office note that indicated "there is no significant neurological findings for [Plaintiff's] reports of pain" (Doc. # 6, p. 80–83); and, (4) Ms. Lubrecht's nursing evaluation, in which she concludes that a neurological evaluation "showed no objective reason for [Plaintiff's] pain[,]" and that although "it is common for someone who has had back surgery to have temporary exacerbations of pain.... there is no physical evidence of a cause for the perceived leg weaknesses." (Doc. # 6, p. 76–77).

The Court will consider each of Defendant's arguments, in turn.

---

**5.** The Court notes that Defendant accentuates its conclusion that Plaintiff did not have a "change in conditions" as of December 3, 1996 that would cause her to be considered "totally disabled." (Doc. # 6, p. 74). The Court points out that the Plan does not require a "change of conditions" to qualify as totally disabled. The Plan requires that "during the Elimination Period and for the first thirty-six (36) months for which monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupa-

tion." (Doc. # 6, p. 7). Plaintiff claims that she became totally disabled as defined by the Plan as of December 3, 1996 and continuing through and beyond the one hundred eighty (180) day Elimination Period. While it is true Plaintiff returned to work for an eleven month period after her initial claim of disability, her diligence in attempting to return to work at a job which she held for over twenty years does not prevent her from claiming long-term disability, if she qualifies for such under the Plan.

First, Defendant evaluates Plaintiff's February 1997 MRI and concludes that it offers no objective medical evidence of Plaintiff's disability. The Court highlights that the purpose of the MRI was to evaluate the prospect of further back surgery to relieve Plaintiff's leg and back pain. (Doc. # 6, p. 91). On January 28, 1997, Dr. Marquart evaluated Plaintiff and wrote: "I wonder if she doesn't have a recurrent disk on the left at the L4–5 level. I've gone ahead and ordered an MRI scan of her back with hopes of getting a clean evaluation of this to see whether or not there is anything that we could surgically decompress." (Doc. # 6, p. 92). On February 21, 1997, Dr. Marquart saw Plaintiff to discuss the results of her MRI. The letter the doctor wrote discussing this appointment is the document from which Defendant extracts the evidence on which it relies, that is, that the MRI performed on Plaintiff showed no evidence of any spinal or nerve root compression. (Doc. # 6, p. 88). However, this assertion is taken entirely out of context, as is confirmed by looking at the February 21, 1997 letter, which in relevant part states:

> [Plaintiff] has no evidence of any recurrent disks, no evidence of any spinal stenosis or nerve root compression. She does have some scarring where she had her previous surgery done for the injury, by Dr. Fred Payne in September of 1994.
>
> I do not feel that Mrs. Ebert will be able to return to work as the type of work that she does has continually re-aggravated her back after her original surgery. Could she return to a light duty position? This was attempted, however, she was told by her employer that there was no light duty. She had to be able to perform all of her duties or she was not able to come back to work. She has restrictions of no bending, twisting, lifting, no direct patient lifting, pushing wheelchairs, etc. She could do mostly sedentary file clerk type work with no heavy lifting and frequent changes of position.
>
> Would she benefit from a rehabilitation program? She certainly would, however, this has been discussed with her Compensation carrier and she was told quite bluntly that she's 56 years of age and that they will not put her in a rehab., she will be nearly 62 and able to file for retirement benefits. Certainly I think rehabilitation would be reasonable. I think she has to go for physical therapy reconditioning program to try to get her to the point where she could hopefully at least do some of her household activities and hopefully get her to the point where she could eventually go to a sedentary to light duty type position.... I do not feel that she has reached her maximum level of improvement without benefit of going through an eight week period of physical therapy. Once she has completed that, if she is no better, then I would certify her as reaching maximum medical improvement and reevaluate her. I doubt she would be able to return to her former position of employment and certainly she has been speaking to her Compensation representative about possible rehabilitation, retraining to see if she would qualify for this.

(Doc. # 6, p. 88).

This letter reveals that Dr. Marquart evaluated whether there was any surgical procedure which would be beneficial to Plaintiff and concluded that there was not. While it is true that the doctor states that he cannot find any evidence of recurrent disks, spinal stenosis or nerve root compression, in this context, it does not mean that there is no *physical* reason for her pain. Instead, he indicates that there is no new or recurring injury to Plaintiff's back which would be relieved by a surgical

procedure. The next two sentences in the letter state that the MRI showed scarring where Plaintiff had previous surgery and that the doctor, in response to his evaluation of Plaintiff's MRI, did not feel that Plaintiff would be able to return to work because the type of work required of her continually re-aggravated her back after her original surgery.

Further, the record shows that Dr. Marquart wrote two other letters, one on February 21, 1997, and one on March 21, 1997, regarding Plaintiff's MRI evaluation. In a letter to the Bureau of Workers' Compensation on February 21, 1997 the doctor wrote:

> [Plaintiff] was referred for a reconditioning physical therapy program to increase her tolerance and ability to do her normal everyday activities, however, since she had returned to work and was unable to continue her work related activities because of significant pain, there really wasn't much or anything in the way of any therapy that I was going to be able to do for her. There certainly was nothing surgical to do. *I did not feel that she could return to work as a cardiopulmonary aide at Barnesville hospital.* I felt that she would benefit from having some form of vocational rehabilitation and perhaps retraining. [Emphasis added].

(Doc. # 6, p. 86).

In the letter to Dr. Souri at the Barnesville Hospital dated February 21, 1997, Dr. Marquart wrote:

> I don't know that there is much of anything that can be done for her for the type of pain that she's having, mostly across her back. I went ahead and requested that she start on some physical therapy, reconditioning program to try to get things under control. Otherwise there's really not much we have to offer her. We'll see her back and continue to follow her and hopefully the physical therapy will decrease her pain so she can do her activities around the home although I doubt that we'll ever get her back to work as a cardiopulmonary aide at the Barnesville Hospital.

(Doc. # 6, p. 87).

Although Plaintiff's MRI did not demonstrate a condition which could be relieved by surgery, the Court nonetheless finds the above medical records offer ample objective medical evidence of her disability.

The second record Defendant relies upon is Dr. Marquart's May 19, 1997 letter to Dr. Souri in which Dr. Marquart opines that Plaintiff's condition did not change after physical therapy and that she had reached maximum medical improvement. (Doc. # 6, p. 84). Defendant then concludes that because Plaintiff still had significant pain after the physical therapy, the pain was subjective and not substantiated by any objective medical documentation. Defendant refers to this letter in Plaintiff's benefit claim denial letter stating: "As of May 19, 1997, Dr. Marquart indicates that [Plaintiffs] condition did not change after physical therapy and the [Plaintiff] ha[s] reached maximum medical improvement." This brief letter states, in its entirety, the following:

> Mrs. Ebert returns today for continuing follow-up. She has gone through her physical therapy program and has not made any significant improvements. I think unfortunately she has reached her maximum medical improvement and is left with some chronic difficulties with her leg. There is not much of anything from a neurosurgical standpoint that is going to give her any significant relief. I don't know of any particular procedure that is going to make a significant difference. Overall I would continue her on her present course of conservative therapy. We'll see her back in approximately six months to make certain she

doesn't develop any significant new neurologic problems but otherwise there is not much we have to offer her.

(Doc. # 6, p. 84). Clearly, the doctor's view was that, even after physical therapy, Plaintiff is left with chronic difficulties in her leg because of her previous back surgery-not because of some type of unsubstantiated subjective pain. Accordingly, the Court finds that Defendant ignored the clear import of Dr. Marquart's opinions and instead selectively extracted limited portions of his report to bolster its denial of the claim.

Third, Defendant relies upon Dr. Marquart's June 4, 1997 office note that indicated there was no significant neurological findings for Plaintiff's reports of pain. Again, Defendant makes a conclusion based on two sentences taken out of their context. The note Defendant refers to is a three page letter in which Dr. Marquart summarizes Plaintiff's medical history starting with her initial diagnosis of a centrally herniated disk and spinal stenosis, to her lumbar diskectomy and laminectomy, and continuing through to the MRI and physical therapy, discussed *supra*. Defendant bases its conclusion on the last two paragraphs of the letter which state:

> [Plaintiff] continues to have problems with any type of repetitive activity such as one would need to do with doing any type of work related activity. She has no other significant neurologic findings. At the present time, due to her complaints of pain and inability to tolerate this, she is totally disabled from any type of gainful employment, certainly she is unable to return to her work at the hospital where she needed help with direct patient care. I feel that she would need training for some other type of activity. Sitting for any length of time causes increasing pain as does standing, walking, bending. She has to lie down for prolonged periods of time just to get through the day. I don't feel that she's presently employable and due to the fact that I cannot find any significant reason for her pain and I doubt that she's going to significantly improve.

(Doc. # 6, p. 83).

From this otherwise clear report of Dr. Marquart, Defendant found that he had observed "no significant neurological findings for [Plaintiff's] reports of pain." In fact, the doctor, after referring to previous surgery, stated that she had "no *other* significant neurological findings," an important distinction. The use, or more accurately the omission, of the word "other" entirely changes the meaning of the sentence. The Court again cautions Defendant in its selective evaluation of the administrative record.

Finally, the Court addresses Defendant's conclusion that Plaintiff's neurological evaluation showed no objective reason for Plaintiff's back and leg pain. Defendant relies on a in-house nursing report performed by its employee, Ms. Lubrecht, R.N. (Doc. # 6, p. 76–77). Ms. Lubrecht reviewed Plaintiff's medical file. As a reviewing nurse, she did not, of course, conduct an exam, meet with Plaintiff, or make a diagnosis. Ms. Lubrecht concluded that there was no significant neurological findings to support Plaintiff's reports of pain, and that it is not uncommon for one who has had back surgery to have temporary exacerbations of pain, however, there was no physical evidence of a cause for the perceived leg weaknesses. (Doc. # 6, p. 76–77). The Court finds Ms. Lubrecht's conclusions unconvincing for the reasons set forth *supra*, i.e. the administrative record is replete with objective medical reports that establish legitimate physical evidence of Plaintiff's disability, and Ms. Lubrecht offers no contrary objective medical findings, rather she selectively reviews that which was in the administrative record.

The single fact is that Plaintiff underwent major surgery, including a lumbar laminectomy and discectomy. It is a complete misreading of the medical records involved in this case to say that Plaintiff's complaints of pain or weakness in the leg are subjective and unverifiable.

In sum, the Court concludes that the foregoing objective medical evidence establishes recognized causes for Plaintiff's complaints of pain, which she voiced both before and after December 6, 1997. "[T]he administrative record reveals that the present case is not one in which a claimant sought long-term disability benefits, based upon mere unconfirmed allegations of pain without any medical foundation." *Castle*, at 855–56. In such a case, Defendant quite reasonably may insist upon objective medical evidence to confirm that the claimant is not a malingerer, and it reasonably might deny a claim for benefits when such evidence is lacking. *See id.* For example, in *Yeager v. Reliance Standard Life Insurance Company*, 88 F.3d 376 (6th Cir.1996), the court reversed the district court's award of long-term disability benefits to the plaintiff. Defendant in the case at bar was also the defendant in *Yeager*, however, the similarities between the two cases stop at that point.

In *Yeager*, the plaintiff claimed to have fibromyalgia/fibrositis. *See id.* at 378. However, the record showed that only one doctor diagnosed plaintiff with such disorder and qualified the diagnosis with the statement that this disability "was not her area of specialty and the she strongly suggested that a disability physician assess the entire situation." *Id.* at 379. Subsequently, a rheumatologist concluded that he believed the plaintiff's "complaints to be real and (in her view) disabling, but [he could] offer no definite diagnosis for these symptoms. It would be difficult for [him] to make a recommendation about disability and would suggest she be assessed by an independent evaluator." *Id.* In a subsequent letter, the same doctor wrote that he believed the plaintiff's "complaints to be real but had been 'unable to document any physical abnormality that might account for her pains. . . .' " *Id.* The plaintiff was evaluated by two other doctors, one a neurologist, who concluded that "he found 'no objective neurologic abnormalities.' " *Id.* The *other* doctor determined that the plaintiff "could perform ninety-five percent of her occupation . . . [and][t]he only job duty in which he felt she was limited was running while carrying an oxygen unit to the scene of an accident or illness episode." *Id.* Based on the foregoing, it is not surprising in the least that the court then concluded that "[i]n the absence of any definite anatomic explanation of plaintiff's symptoms, we cannot find that the administrator's decision to deny benefits was arbitrary and capricious." *Id.* at 382.

The Court finds that the case at bar is clearly distinguishable from *Yeager*, and instead finds it much more analogous to *Castle*-another case in which Defendant was the defendant. *See Castle v. Reliance Standard Life Insurance*, 162 F.Supp.2d at 855–56 (S.D.Ohio 2001). The district court in *Castle* reversed the defendant's denial of the plaintiff's claim for long-term disability benefits, concluding that the defendant acted arbitrarily and capriciously in its denial. In that case, the plaintiff was a master finisher for an advertising display company. A job description written by the plaintiff's employer stated that master finishers must be able to "stand on feet ten (10) hours per day." *Id.* at 843–44. The plaintiff was diagnosed with heel spurs and plantar fascitis. *See id.* at 845. The defendant denied plaintiff's claim for long-term disability benefits based on her "ability to walk and to navigate stairs without difficulty or pain" at a therapy session, and the absence of any "objective medical evidence, after [that therapy session], estab-

lishing she was still unable to perform the material duties of her regular occupation." *Id.* at 852. The court concluded, with respect to the first issue, that the fact that the plaintiff "performed well during a therapy session on [a particular date], by walking without pain does not demonstrate her ability to return to work as of that date .... It does not reasonably follow that she was capable of standing 10 hours per day, as her written job description required, merely because she was able to ambulate without pain during a brief therapy session." *Id.*

The similarities between *Castle* and the case at bar are apparent. In both cases the plaintiff's doctors identified anatomic, objective explanations for their pain. In the case *sub judice,* Plaintiff provided Defendant with a plethora of medical reports and diagnostic testing results, which provided objective medical evidence that she suffered from the abnormalities set forth above. The Court concludes, for the reasons set forth *supra,* that nothing more was required of Plaintiff, and that Defendant acted arbitrarily and capriciously in concluding that she was not totally disabled as defined by the Plan.

### IV.

In light of the foregoing, the Court concludes that Defendant's denial of Plaintiff's claim was arbitrary and capricious and that Plaintiff is entitled to receive long-term disability benefits. Defendant's decision to deny long-term disability benefits to Plaintiff is **REVERSED** and Defendant's Motion for Summary Judgment is **DENIED**. The Clerk shall enter **FINAL JUDGMENT** in favor of Plaintiff and against Defendant, **DIRECTING** Defendant to award Plaintiff retroactive long-term disability benefits for a thirty-six (36) month period beginning on June 4, 1997, the date that Plaintiff's one hundred eighty (180) day elimination period expired. Defendant is **DIRECTED** to review Plain-

tiff's claim, consistent with this opinion, to determine whether she is entitled to continuing monthly disability payments beyond the initial thirty-six (36) month period.

**IT IS SO ORDERED.**